## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DESTINY CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-1033 |
| | ) | |
| NEWMAN UNIVERSITY, INC. and | ) | |
| VICTOR TRILLI | ) | |
| Defendants, | ) | |

## COMPLAINT

COMES NOW Plaintiff, Destiny Clark, by and through her attorney of record, Jennifer M. Hill of McDonald Tinker PA, and for her Complaint against Defendants alleges and states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.      The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

3.      This Court has jurisdiction to hear these claims.

4.      Venue is proper in that all of the claims herein occurred within Sedgwick County, Kansas, and all of the parties and witnesses known at this time are from Sedgwick County, Kansas.

## THE PARTIES

5.     Plaintiff Destiny Clark ("Ms. Clark") is an individual residing in Sedgwick County, Kansas. Ms. Clark is an African American.

6.     Defendant Newman University, Inc. (hereinafter "Newman") is a Kansas corporation registered as a Not for Profit Corporation in Wichita, Kansas, which may be served with process through its Registered Agent, Newman University, Inc., 3100 McCormick Ave., Wichita, Kansas 67213.

7.     Defendant Victor Trilli ("Mr. Trilli") is an individual residing in Sedgwick County, Kansas, and may be served with process at 6820 W. Shade Ct., Wichita, KS 67212. Mr. Trilli worked as Defendant Newman's athletic director and Ms. Clark's direct supervisor from 2015-2018.

## FACTS RELEVANT TO PLAINTIFF'S CLAIMS

### Recruitment and Strength Coach Position

8.     Plaintiff was continuously employed by Defendant Newman from May 2015 through June 2018. Victor Trilli actively recruited Ms. Clark to coach at Defendant Newman as the head volleyball coach.

9.     When Ms. Clark interviewed for the position of head volleyball coach, she expressed she was also qualified and possessed the appropriate certifications for the open strength coach position. A large portion of her interview with Defendant Trilli and others focused on her experience as a trainer and qualifications as a strength coach.

10.     In May 2015, Ms. Clark met with Defendant Trilli in person to negotiate her salary. Defendant Trilli offered Ms. Clark, verbally and in writing, the volleyball coaching position, with an offer of $37,000. This salary alone would have been a significant cut in pay to Destiny from her current position.

11.     At this meeting, Ms. Clark clearly told Defendant Trilli she wanted the position but could only afford to take it if she was also named the strength coach for all athletes. The two determined that she would be the strength coach and the University would pay her $20,000 for that position. The offer was made verbally but not in writing.

12.     No written letter about the strength coach position was ever prepared or provided to Ms. Clark. She inquired about this issue multiple times from May 2015 through spring 2016. When she asked, Defendant Trilli advised Ms. Clark she should "just focus on being a good volleyball coach" and that eventually they would get the strength coach offer in writing.

13.     Ms. Clark's work included recruiting, managing, budgeting, and coaching the women's volleyball team at Defendant Newman. Despite not being compensated, Ms. Clark created strength training workouts and consulted with other coaches on strength workouts for their team during her initial school year at the University.

14.     In the summer of 2016, the NCAA changed its rules and required that Defendant Newman have a dedicated strength coach with specific certifications. Ms.

3

Clark was the only Newman coach on staff with the certification necessary. Defendant Trilli announced to all coaches that each sports' coach would strength train their own athletes but they would just "use" Ms. Clark's certification.

15.     Ms. Clark advised Defendant Trilli she was not comfortable having her certification "used" in such a way, and it would only be appropriate if she was actually the coach designing workouts for the athletes. Ms. Clark reminded Defendant Trilli of the $20,000 he had initially promised her. He laughed in her face and said, "I'd give you a $2,000 stipend for that."

16.     Almost immediately after this conversation, Defendant Newman announced it hired Renaire Palmer (a lesser qualified male) for the strength coach position, at a $20,000 annual salary. Palmer's certifications are not as advanced as Ms. Clark.

17.     In spring of 2018, Mr. Palmer's employment with the University ceased.

18.     In May 2018, Ms. Clark applied for the strength coach position when it opened again.

19.     Ms. Clark was set up to interview for the position. After her interview was rescheduled on multiple occasions, she formally interviewed with Defendant Trilli and additional members of Defendant Newman staff on May 30, 2018.

20.     On June 11, 2018, Defendant Newman informed Ms. Clark she was not selected for the Strength and Conditioning Coaching position. A male coach was hired by Defendant Newman.

**Conflict During Employment**

21.     Ms. Clark's work at Defendant Newman was rife with conflict from her initial season until she left employment.  Due to inadequate practice facilities, the various team sports at Defendant Newman are required to share gym space and coordinate practice schedules with each other.

22.     Ms. Clark's attempts to coordinate with other coaches consistently created conflict. Other teams practiced over and into her team's practice time. Ms. Clark's team (female sport) was routinely placed at a lower priority than male teams.

23.     After conflicts initially arose, Defendant Trilli started coming into Ms. Clark's office to "talk". The nature of the discussions was highly personal and upsetting to Ms. Clark. These discussions included questions about her dating life, whether or not she was going to have children, her hair styles and other personal matters. Ms. Clark had a male friend intervene on her behalf (asked him to ask Defendant Trilli to stop these conversations) and eventually these meetings stopped. Upon information and belief, male coaches were not subjected to highly personal and inappropriate one on one meetings with Defendant Trilli.

24.     Once those meetings stopped, whenever Ms. Clark reported a conflict or asked for Defendant Trilli to assist in a scheduling problem, Defendant Trilli would simply demand that Ms. Clark acquiesce to men's basketball team's demands.

25.     In multiple meetings with men's basketball coaching staff, Ms. Clark was belittled, openly mocked and treated with hostility. Defendant Trilli was present at these meetings and made no effort to mediate the conflict or effectively manage the problems with the coaches' schedules.

26.     Male coaches with scheduling problems related to court time in Newman's gym often had their problems resolved within the same day with no contentious meetings and no follow up meetings discussing those coaches' "feelings".

27.     On multiple occasions, after meetings with men's basketball coaching staff and Defendant Trilli, individuals would mock Ms. Clark in front of her team and other athletes.

28.     Ms. Clark was advised by another female coach that if the other coach wanted anything from Defendant Trilli, she would just cry in front of him to get her way. This colleague had been coaching at Defendant Newman for a number of years and told Ms. Clark this method was the most effective way to get Defendant Trilli to help her.

**Student Athlete Conflict**

29.     Ms. Clark had repeated conflict with one specific student athlete, a male basketball player. This individual sexually harassed members of the women's volleyball team, interrupted the volleyball team's official practice and eventually escalated with two specific physical confrontations on September 1, 2016 and October 2, 2017.

30.     Ms. Clark complained about this athlete to his coaches on the basketball team and to Defendant Trilli from fall semester, 2015 for the next two years.

31.     When Ms. Clark complained about this athlete, she was told she "did not understand him," that she needed to be "patient" because he had a difficult childhood and that she was overreacting. Further she was advised that this student's coaches would "handle" it. The student's conduct never changed.

32.     The athlete was employed in a work study program and worked as a janitor around the athletic department. On repeated occasions, after Ms. Clark complained to basketball coaches about this athlete, volleyball team equipment went missing. Ms. Clark reported the stolen property and repeatedly confronted the athlete's coaches and Defendant Trilli with evidence that she believed established this student had stolen volleyball team property.

33.     Stolen property from the volleyball locker and storage area had to be replaced out of the volleyball team's budget.

7

34.     The student athlete openly disrupted Ms. Clark's practices. Ms. Clark repeatedly had to request the athlete to leave the gym during her teams practice time.

35.     Despite the repeated complaints and confrontations with this athlete, the student had a two-page full color article about him in the Fall 2017 publication, *Newman University Magazine.* The decision to feature this student was approved by Defendant Trilli and President Noreen Carocci.

36.     On October 2, 2017, the athlete was listening to very loud music with obscenities from a stereo immediately before the volleyball team's practice. Ms. Clark approached the student and told him it was time to go and it was her team's practice time. The student turned his music louder.

37.     Ms. Clark asked the student to leave the gym again, and this time turned off his music. The student turned the music back on and ignored her. On a final occasion, Ms. Clark spoke very loudly to him and told him he needed to leave. The student stormed into Ms. Clark's face screaming. He charged at Ms. Clark in a threatening manner

38.     Though she was very scared, Ms. Clark walked away from the student, and immediately walked into Defendant Trilli's office to report the event. Further, Ms. Clark advised Trilli she did not want this athlete at the volleyball game the following day. Trilli never responded to her request to keep that student from attending the

game. Ms. Clark then asked the head of Newman security to keep the student from attending the women's volleyball game.

39.     Ms. Clark contacted the head of security regarding security concerns and requested that this student be kept out of the game on October 3, 2017. The head of security then discussed the matter with the Dean of Students.

40.     After the discussion, the Dean of Students banned this student from DeMattias and O'Shaughnessy buildings. Despite being aware of the ban, this student continued to go to the building and used the computer in the coaches' copy room, literally down the hall from Ms. Clark's office.

41.     On November 10, 2017, the Dean of Students wrote a warning to this student regarding his violation of the building ban and advising this student that he would be subjected to disciplinary action if he entered the building again.

42.      On November 20, 2017, Ms. Clark sought court assistance and obtained a temporary Protection from Abuse/ Protection from Stalking order from Sedgwick County District Court. The Court initially entered a temporary order restricting the athlete's physical location to ensure he was never around Ms. Clark. He was banned from the athletic department building both legally and by the University.

43.     At a subsequent hearing on the PFS, on December 7, 2017, the student advised the Sedgwick County District Court that he was nearly done with school and "never coming back to Kansas" once he was done with classes in December 2017. At

9

this hearing, the student also presented handwritten notes from Defendant Trilli of Trilli's "investigation" into the conflict with Ms. Clark. The student told the judge that Trilli advised the student that the student was not at fault and that Ms. Clark was lying.

The Court's PFA order indicated that the temporary order remains in place until he left the state. After his studies were complete and he left the state, then the Order would expire.

44. Throughout this series of events, Ms. Clark regularly communicated with the Newman director of security and John Walker, the Title IX investigator about the conflict with this student. The director of security advised Ms. Clark he was not sure what he would be able to do to keep her safe from this individual and agreed with Ms. Clark's concerns, noting that this student appeared capable "of anything."

45. This male student athlete finished his coursework at Defendant Newman in December 2017. In the spring of 2018, because of history and safety concerns, Ms. Clark began inquiring about whether or not he would attend spring graduation festivities and "walk" with his class.

46. Defendant Newman's appointed contact person for Ms. Clark, Jennifer Gantz, provided no answers to Ms. Clark for weeks.

47. Eventually, Ms. Gantz advised Ms. Clark the athlete would be at graduation but Newman did not really think Ms. Clark would attend the graduation so

they didn't think it mattered. Ms. Clark advised that she intended to attend graduation, and asked if the University would make provisions for her safety.

48.     Defendant Newman did nothing to aid Ms. Clark. Instead, Ms. Clark coordinated an escort from the security department, she advised the Defendant Newman of rules, including not allowing the student into the athletic department and she told the head of security about her concerns.

49.     At no time did the Defendants take any of Ms. Clark's concerns about this student athlete seriously; they did not discipline him for inappropriate conduct; they failed to enforce a Court order on him; Newman even "highlighted" this student in their own magazine and publication and the Defendants generally subverted Ms. Clark's authority as a coach and staff. There were no consequences for this athlete for his conduct and he acted with full impunity by Defendants.

**Title IX Complaint**

50.     After two full school years of watching her female athletic team being treated less favorably than the male team, Ms. Clark filed a Title IX complaint. This complaint was filed in October 2017.

51.     Part of Ms. Clark's Title IX complaint included her concerns about the harassment and inappropriate conduct of the male basketball player and the failure of basketball coaching staff to properly control or manage this player.

52.     Part of Ms. Clark's Title IX complaint addressed her teams unequal access to practice facilities.

53.     On information and belief, Defendant Trilli verbalized to others (including Newman's Human Resource Director) his intent to retaliate against Ms. Clark when he was advised of her Title IX Complaint. Newman's President, Noreen Carocci, was told of Trilli's intent to retaliate, but Carocci defended Trilli and opposed even a verbal warning to him.

54.     On information and belief, President Carocci made it clear to Newman's Human Resource Director that Carocci (before the investigation had even begun) considered Clark's Title IX complaint to be a false report of discrimination.

55.     The Title IX complaint was set to be investigated by John Walker, a university Title IX officer.

56.     Mr. Walker reassigned Ms. Clark from Defendant Trilli to Levi Esses (Dean of Students) for the purposes of supervision.

57.     Mr. Walker began investigating Ms. Clark's claim by gathering documentation and interviewing witnesses.

58.     On information and belief, during the investigation, President Carocci criticized Newman's Title IX investigation procedure as taking too long, in a meeting with the Human Resource Director.

59.     After multiple situations that left Ms. Clark concerned for her safety, Mr. Walker advised Ms. Clark, he thought she should work from home. This discussion occurred on November 10, 2017.

60.     During this time, Mr. Walker and the head of Human Resources, Mandy Greenfield, were being retaliated against for their participation and appropriate handling of Ms. Clark's Title IX complaint.

61.     Mr. Walker kept Ms. Clark advised of his progress on his investigation and told Ms. Clark in December 2017, that he had almost completed his investigation and she should be safe to return to campus soon.

62.     Instead, Defendant Newman fired Mr. Walker and Ms. Greenfield just as the investigation was almost complete because Newman anticipated a finding of unlawful discrimination against Clark in violation of Title IX.

63.     Levi Esses, Ms. Clark's new supervisor, filed a Title IX complaint against Defendant Newman during this time for retaliation by Defendant Trilli. Mr. Esses ultimately left Defendant Newman and sought employment elsewhere as of December 2017.

64.     After Mr. Esses left employment with Defendant Newman, Ms. Clark repeatedly requested information about who was assigned as her supervisor. Defendant Newman refused to assign a new supervisor to Ms. Clark.

65.     Eventually Defendant Newman advised Ms. Clark she should "consult with" Jennifer Gantz, the Treasurer of the University. After multiple emails and discussions with Ms. Gantz, Ms. Clark was advised that Mr. Trilli was her supervisor.

66.     Defendant Newman hired Lewis Brisbois law firm to "start over" on Ms. Clark's Title IX investigation. The law firm repeatedly advised Ms. Clark they were "independent fact finders," trying to professionally handle her Title IX investigation. Ms. Clark cooperated with the interview requests from the law firm.

67.     Ms. Clark repeatedly, from November 10, 2017 through January 17, 2018, asked to return to campus to coach her team. She was denied this request. While the initial decision to have Ms. Clark work from home was to protect her from contact with the male student athlete, Defendant Newman continued to deny Ms. Clark access to her work.

68.     The male student athlete Ms. Clark was concerned about finished his coursework at the University in December 2017 and was no longer living on campus or attending classes after December 2017. As such, any claim by Defendant Newman that her return was related to the safety issue, originally presented in December 2017, was clearly unsubstantiated.

69.     Upon returning to campus on January 22, 2018, Mr. Trilli refused to speak to Ms. Clark for many weeks and had limited or nearly non-existent contact for months.

70.     Defendant Newman offered Ms. Clark what initially appeared to be "mediation" sessions. These sessions were never a true mediation with all relevant parties working through conflict. To the contrary, the "counselor" tried to perform personality testing on Ms. Clark and "coach" her on how to handle herself on confrontations.

71.     Ultimately, Defendant Trilli agreed in a joint meeting with the counselor that he would provide Ms. Clark with a positive reference. The meetings never attempted to actually work through the basic scheduling conflicts and issues that originally had been Ms. Clark's concern and complaints with Defendant Newman.

**Further Title IX Violations**

72.     During the Lewis Brisbois "investigation," Ms. Clark advised the Defendant Newman hired counsel of the fact that during the summer of 2017, male student athletes were allowed to stay on campus in dorms free of charge but that female athletes were not provided the same treatment. Nothing in the Title IX report or findings even noted that such claims were brought to their attention.

73.     After the conclusion of Ms. Clark's Title IX investigation by the Lewis Brisbois law firm, retaliation and disparate treatment of the women's volleyball team continued.

74.     In the winter of 2018, Ms. Clark and the head volleyball coach at Friends University scheduled a volleyball tournament to be hosted at Defendant Newman in

April, 2018. The tournament would act as a recruitment tool for Ms. Clark and provide

the women's volleyball team a unique opportunity to host teams from the surrounding

area.

75.     On February 14, 2018, Ms. Clark was advised that an outside speaker

would be coming to Defendant Newman that same date and that the speaker might

interfere with her team's planned tournament.

76.     Ms. Clark worked with Defendant Newman to arrange the schedule,

including ending the tournament by 2:30 pm on April 14, 2018 (Saturday) to ensure

they were out of the gym. The speaker was scheduled to begin at 7:00 pm.

77.     Ms. Clark had seven incoming freshman volleyball players planning to

attend the tournament and use it as an opportunity to see campus and the volleyball

facilities and locker rooms.

78.     On April 9, 2018 (Monday), after the entire schedule and tournament had

been finalized with other teams, Defendant Newman advised Ms. Clark she could no

longer use the facilities at all for her tournament on Friday April 13 or Saturday April

14. Jennifer Gantz told Ms. Clark that she could use a local high school gymnasium for

the tournament.

79.     The publicity for the event, including posters, showed that the event time

had changed from 7:00 pm to 1:30 pm and multiple speakers were added to the event.

Ms. Clark was not advised of these changes to the event as they were made but only a

few days before when she was told the tournament her team was "hosting" would be moved off campus.

80.     In April 2018, Ms. Clark was advised that all freshman students would be required to attend an orientation on Friday, August 24, 2018. Ms. Clark immediately began discussing with various administrators at the University that the volleyball team was already scheduled for a four game volleyball tournament in Texas, the team's first official games of the fall season. Ms. Clark requested that the instruction provided during the freshman orientation be provided to her seven freshman volleyball players at another time so they could travel with the team. She offered three weeks of optional dates for the students to attend a make-up orientation.

81.     Defendant Newman denied Ms. Clark's requests. Ms. Clark appealed this decision to other administrators citing NCAA regulations and advising the administrators that if the seven freshmen could not attend the tournament in Texas, the entire volleyball team would have to withdraw from the tournament.

82.     Ms. Clark advised her team and her teams' parents of the University's decision. Ms. Clark told the team that she did not agree with the decision and was attempting to get it overturned.

83.     Defendant Newman refused to accommodate Ms. Clark's seven freshman athletes.  President Noreen Carrocci further threatened disciplinary actions against Ms.

Clark for her "unfortunate" decision "to involve Newman students and parents" in the scheduling issues.

84.     The volleyball team withdrew from the tournament in Texas and played no games that weekend. Ms. Clark's discussions with other Division II volleyball coaches informed her that all other teams were competing that same weekend, a fact that placed Newman's volleyball team at a pointed disadvantage.

**Annual Evaluation**

85.     Ms. Clark requested from Mr. Esses during her "suspension" and requirement that she work from home, that she be provided her annual evaluation. At the time of the filing of her Title IX complaint in October 2017, Ms. Clark was due her annual evaluation.

86.     Despite specifically requesting her annual evaluation from Mr. Trilli, Mr. Esses, Human Resources, and eventually Jennifer Gantz, Ms. Clark was never provided with an evaluation by anyone at Defendant Newman for the final year and a half of her employment.

87.     Ms. Clark provided her self-evaluation answer to the Human Resources department as she was advised to do.

88.     Defendant Newman has knowingly and intentionally disregarded disrespectful, illegal and tortious conduct by its employees and supervisors. As a result

of the inactions by the Defendants, collectively, Ms. Clark has sustained severe

emotional distress and other damages.

89.     Defendant Trilli has knowingly and intentionally created a hostile work

environment against Ms. Clark based on her gender as female.

90.     All Defendants have openly and continuously retaliated against Ms. Clark

for informally and formally lodging complaints and voicing concerns against

Defendant Newman and Defendant Trilli's policies, customs, procedures and unfair

treatment of her team and of her individually.

91.     Plaintiff received her right to sue letter from the EEOC, dated December

20, 2018.

### COUNT 1: TITLE IX RETALIATION

92.     Plaintiff incorporates by reference all other allegations set forth in the

paragraphs above.

93.     Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681

and its implementing regulation 34 C.F.R Part 106 prohibit discrimination based on sex

and prohibit retaliation against any individual who has made a complaint, testified, or

participated in any manner in an investigation into alleged noncompliance with Title

IX. *See* 34 C.F.R. § 100.7(e).

94.     Employees of federally funded educational institutions who raise

complaints,   or   participate   in   investigations,   concerning   compliance   with   the

substantive provisions of Title IX are protected from retaliation by 34 C.F.R. § 100.7(e) and enjoy an implied private right of action for money damages to vindicate their rights.

95.     Plaintiff has a federal statutory right under Title IX to be free from retaliatory action for protected participation or opposition under Title IX in a federally funded educational facility.

96.     Plaintiff was entitled to raise complaints concerning noncompliance, to oppose discrimination and retaliation, and to participate in investigations concerning the alleged violations of Title IX and likewise was entitled to the protection against retaliation.

97.     Defendants had actual and/or constructive knowledge and notice of the sexual harassment or discrimination complaints alleged herein.

98.     Defendant Newman, through its employees and agents, ignored or disregarded Title IX's mandate for equal educational opportunities.

99.     Defendant Trilli ignored and disregarded Title IX's mandate for equal educational opportunities.

100.    Plaintiff engaged in a protected activity under Title IX when she filed a Title IX complaint and then participated in the investigation of her own complaint.

101.     After receiving reports of the alleged discrimination, harassment and retaliation, Defendant Newman, by and through its employees and agents, retaliated

against Plaintiff for opposing discrimination and retaliation at Newman and for participating in the investigations.

102.    Plaintiff suffered adverse actions as a result of her protected activity when Defendant refused to allow her to return to campus to work, continued in a pattern of retaliation and discrimination after her return to campus, forced her to attend counseling sessions that amounted to being told how to behave and generally treated as a less valuable coach than her male counterparts.

103.    Defendant Newman, through its employees and agents, demonstrated deliberate indifference to Title IX's mandates for equal educational opportunities and anti-retaliation for protected activity.

104.    The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of Defendant Newman and its employees and agents while acting within the scope and course of their employment.

105.    As a direct and proximate result of the Defendant Newman's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorney's fees and costs.

106.     As a direct and proximate result of the Defendant Newman's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with her compensation at Newman.

107.     Defendant Newman's indifference and resulting action was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being, justifying the imposition of punitive damages.

<u>**COUNT 2: EQUAL PAY ACT**</u>

108.     Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

109.     In May of 2015, Ms. Clark was offered the position as volleyball head coach, which she accepted.

110.     Ms. Clark was paid $37,000 annually for her duties as the volleyball head coach.

111.     Upon information and belief, Ms. Clark, as the volleyball head coach, was paid less than all other head coaches at Newman who performed work substantially equal in skill, effort, and responsibility, and who had the same or substantially similar conditions of work.

112.     By not paying Ms. Clark the same as her male counterparts who performed work substantially equal to that of her, and who had the same or substantially similar conditions of work, Newman violated the Equal Pay Act.

113.    Additionally, Ms. Clark was initially offered $20,000 in annual salary to be the strength and conditioning coach for Newman. From May of 2015 to the summer of 2016, Ms. Clark took on duties as the strength and conditioning coach after being promised that she would be hired for the position. Ms. Clark was never paid for her work even though she performed duties associated with the position.

114.    Ms. Clark continuously followed-up with Newman about her position and pay as the strength and conditioning coach, and was told on multiple occasions that the paperwork would be finalized to confirm her position.

115.    In the summer of 2016, the NCAA passed a rule that all Division II schools needed a dedicated strength coach with specific certifications. Ms. Clark advised Defendant Trilli she could design workouts for the athletes of all teams.

116.    Defendant Trilli approached Ms. Clark about hiring her for the strength and conditioning coach position. Ms. Clark requested their original agreement of $20,000 in annual salary be honored. Trilli laughed in Ms. Clark's face and offered her a $2,000 stipend instead. Ms. Clark declined the offer.

117.    After declining Defendant Trilli's offer, Newman announced Renaire Palmer, a man, would be the strength and conditioning coach for Newman and paid him $20,000 in annual salary.

118.     Mr. Palmer did not have the same advanced certifications that Ms. Clark possessed. Despite this fact, he was offered and paid 10 times more than what Defendant Trilli offered to Ms. Clark.

119.     The strength and conditioning coach position offered to Mr. Palmer was equal in skill, effort, and responsibility, and had the same or substantially similar conditions of work, as that offered to Ms. Clark.

120.     Defendant Newman violated the Equal Pay Act by offering Ms. Clark a substantially less salary as was offered to a male to work in the exact same position.

## COUNT 3: TITLE VII RETALIATION
### (Defendant Newman)

121.     Plaintiff incorporates the above paragraphs in the Background Facts as if fully set forth herein.

122.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq,* prohibits discrimination based on sex and prohibits retaliation against any individual who has made a complaint, testified, or participated in any manner in an investigation into alleged noncompliance with Title VII.

123.     Plaintiff has a federal statutory right under Title VII to be free from retaliatory action for protected participation or opposition under Title VII.

124.     Plaintiff is protected under Title VII from retaliation for opposing sexual harassment and retaliation of complainants and witnesses.

125.    Plaintiff was entitled to raise complaints concerning noncompliance, to oppose discrimination and retaliation, and to participate in investigations concerning the alleged violations of Title VII and likewise was entitled to the protection against retaliation.

126.    Defendant Newman had actual and/or constructive knowledge and notice of the sexual harassment or discrimination complaints alleged herein.

127.    Plaintiff engaged in a protected activity under Title VII when she participated in the investigations and opposed interference by Newman administrators and advised Newman administrators of potential liability for failing to follow policy and take immediate and appropriate action.

128.    After receiving reports of the alleged discrimination, harassment and retaliation, Defendant Newman, by and through its employees and agents, retaliated against Plaintiff for opposing discrimination and retaliation at Newman and for participating in the investigations.

129.    Plaintiff suffered adverse actions as a result of her protected activity when Defendant placed interfered with her ability to coach volleyball, failed to comply with Court orders restricting the access of the student athlete who cause Ms. Clark to fear for her safety and when Ms. Clark was repeatedly treated less favorably than her male counterparts.

130.     The aforesaid occurrences were the direct and proximate result of the negligence and carelessness of Defendant Newman and its employees and agents while acting within the scope and course of their employment.

131.     As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoyment of life, and attorney's fees and costs.

132.     As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has sustained or will sustain damages for lost pay and benefits in an amount commensurate with her compensation at Newman.

133.     Defendant's indifference and resulting action was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well-being, justifying the imposition of punitive damages.

### COUNT 4: TITLE IV HOSTILE WORK ENVIRONMENT
### (Defendant Newman)

134.     Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

135.     Ms. Clark is female.

136.     Ms. Clark sustained continued, pervasive and severe harassment when she was supervised by Defendant Trilli, in the following nonexclusive ways:

a. By being singled out by Defendant Trilli for personal and inappropriate conversations about her private life when such harassment did not occur against similarly situated male employees;

b. By being belittled and treated with disdain during her attempts to address issues related to her conflicts with co-workers and student athletes from other teams;

c. By having emails and requests for information ignored;

d. By refusing to provide Ms. Clark a direct supervisor who was not her alleged harassed;

e. By refusing to provide Ms. Clark her annual evaluation despite repeated requests for the same;

f. By requiring Ms. Clark to participate in "counseling" to discuss her feelings and try to compel her to take a personality test;

g. By being stonewalled when she attempted to perform her job tasks;

h. By being threatened by Defendant Trilli and President Carrocci when she made complaints about treatment of herself or her team; and

i. By being treated worse when she filed a charge of discrimination with the EEOC.

137.    Ms. Clark reported this harassment to Defendant Newman both directly (to her supervisor Defendant Trilli) and indirectly by filing the Title IX complaint.

138.    The harassment altered the terms, conditions and privileges of employment for Ms. Clark.

139.    The harassment clearly stemmed from sexist animus as her treatment was distinct from the treatment of her male counterparts.

140.    The Defendants collectively created a hostile work environment by allowing a hostile and sexist supervisor to humiliate Ms. Clark.

141.    As a direct and proximate result of this violation of the law, Ms. Clark suffered damages due to the Defendants' collective failure to create a workplace free of discrimination, where gender is not a barrier to opportunity.

## COUNT 5: TITLE VII GENDER DISCRIMINATION
### (Defendant Newman)

142.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

143.    Ms. Clark is female.

144.    Ms. Clark satisfactorily performed her duties as a volleyball coach in managing her team, recruiting new players, coaching in practices and games and mentoring her team of student athletes.

145.    Ms. Clark was treated differently than her male counterparts, including feedback and discussions that were not similarly handled with male coaches. This

28

disparate treatment was clearly motivated by sex discrimination as the supervisor making these decisions routinely was the same supervisor who continually harassed Ms. Clark.

146.    Ms. Clark was inappropriately disciplined, monitored, excluded from decisions, ostracized and penalized by the Defendants because they failed to provide a safe working environment for her.

147.    As a direct and proximate result of this violation of the law, Ms. Clark suffered damages due to the Defendants' discrimination against her.

## COUNT 6: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

148.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

149.    Defendant Trilli intentionally, willfully or wantonly caused emotional distress on Ms. Clark.

150.    Defendant Trilli's conduct was extreme and outrageous.

151.    Ms. Clark has suffered extreme and severe emotional distress due to the conduct of Defendant Trilli.

152.    Ms. Clark's emotional distress was caused by the actions of Ms. Trilli.

153.    Ms. Clark suffers from compensable damages.

## COUNT 7: NEGLIGENT HIRING/RETENTION

154.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

155.    Defendant Newman had substantial opportunity to educate itself about the tendencies of Defendant Trilli to create a hostile environment for female coaches and to conduct himself in a manner sufficient to establish the tort of outrage.

156.    Defendant Newman knew or should have known that continued employment of Defendant Trilli would risk the harm of its workers, specifically those that he supervised.

157.    Defendant Newman received repeated complaints of retaliation by Defendant Trilli, including from individuals other than Ms. Clark.

158.    Defendant Newman had a duty to protect its employees from other employees that Defendant Newman knew or should have known would create a hostile environment and cause employees, specifically Plaintiff, extreme emotional distress.

159.    Defendant Trilli did in fact inflict extreme emotional harm on Ms. Clark, as Defendant Newman had been previously warned.

160.    Defendant Newman is liable for negligent hiring or retention under Kansas law.

161.    As a direct and proximate result of this violation of the law, Ms. Clark suffered damages due to Defendant Newman's failure to properly demote, reassign or terminate Defendant Trilli prior to continued conflict and humiliating conduct towards Ms. Clark.

## COUNT 8: NEGLIGENT TRAINING/ FAILURE TO TRAIN

162.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

163.    Defendant Newman had substantial opportunity to train and correct the illegal, hostile and humiliating actions of Defendant Trilli, who by 2017 had established a sexually hostile environment and humiliating conduct towards Ms. Clark.

164.    Defendant Newman had substantial opportunity to train and correct the illegal, hostile and humiliating actions of Defendant Trilli, who by 2017 had established an athletic department and educational institution operating in violation of Title IX.

165.    Defendant Newman knew or should have known that Defendant Trilli needed to be removed from supervision of Ms. Clark or undergo extensive training or that he would risk the harm of female university employees; female student athletes; employees participating in protected activity and risk harm to the University itself, specifically those that he supervised and specifically Ms. Clark.

166.    Defendant Newman had a duty to protect its employees from supervisors that Defendant Newman knew or should have known would create a sexually hostile

or extreme and outrageously hostile environment and to attempt to correct Defendant Trilli's illegal and inappropriate conduct.

167.    Defendant Trilli did in fact inflict harm on Ms. Clark, as Defendant Newman had been previously warned.

168.    Defendant Newman is liable for negligent training or failing to train Defendant Trilli under Kansas law.

169.    As a direct and proximate result of this violation of the law, Ms. Clark suffered damages due to Defendant Newman's failure to properly correct and re-train Defendant Trilli at any time after Ms. Clark began formally reporting to the University her concerns.

### COUNT 9: NEGLIGENT SUPERVISION

170.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

171.    Defendant Newman had substantial opportunity to educate itself about the tendencies of Defendant Trilli to create a hostile work environment in violation of state and federal law.

172.    Defendant Newman knew or should have known that Defendant Trilli required extra supervision, especially around female subordinates due to Ms. Clark's prior reporting of his illegal conduct. Further, investigations into Defendant Trilli and

his conduct as Newman University Athletic Director provided extensive information into the conduct and customs of Defendant Trilli that violated state and federal law.

173.    Defendant Newman knew or should have known that if left unsupervised, Defendant Trilli would risk the harm of female workers, specifically those that he supervised.

174.    Defendant Newman had a duty to protect its employees from other employees that Defendant Newman knew or should have known would create a racially hostile environment.

175.    Defendant Trilli did in fact inflict harm on Ms. Clark, as Defendant Newman had been previously warned.

176.    Defendant Newman is liable for negligent supervision under Kansas law.

177.    As a direct and proximate result of this violation of the law, Ms. Clark suffered damages due to Defendant Newman's failure to properly supervise Defendant Trilli during his supervision of Ms. Clark.

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants; that the Court award Plaintiff all damages to which she is entitled, including, but not limited to, lost wages, statutory penalties, compensatory damages, and damages for emotional distress and mental anguish; that the Court award her reasonable attorney fees and the costs of this action; and that the Court allow such other and further relief as the Court deems just and equitable.

Respectfully submitted,

/s/ Jennifer M. Hill
Jennifer M. Hill, #21213
MCDONALD TINKER PA
300 W. Douglas, Ste. 500
Wichita, KS 67202
T:  316-263-5851
F:  316-263-4677
E:  jhill@mcdonaldtinker.com
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury in this case.

/s/ Jennifer M. Hill
Jennifer M. Hill

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas, as the place of trial in this case.

/s/ Jennifer M. Hill
Jennifer M. Hill