## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DESTINY CLARK,

              Plaintiff,

v.

NEWMAN UNIVERSITY, INC.,

           Defendant.

Case No.: 6:19-cv-01033-JWB-GEB

## PRETRIAL ORDER

A pretrial conference was conducted in this case on February 3, 2022, by U.S. Magistrate Judge Gwynne E. Birzer. The plaintiff, Destiny Clark, appeared through counsel Jennifer Hill and Andres Foulston of McDonald Tinker PA. Defendant, Newman University, Inc., appeared by counsel Alan Rupe and Nanette Turner Kalcik of the law firm Lewis Brisbois Bisgaard and Smith LLP.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1)  **PRELIMINARY MATTERS.**

    a)  **Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

    b)  **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

    c)  **Venue.**  Venue in this court is not disputed.

    d)  **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the

following law: Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681; Title VII of the Civil Rights Act of 1964, as amended; the Equal Pay Act, 29 U.S.C. § 206(d); and the Religious Freedom Restoration Act and/or the Ministerial Exception Doctrine.

**2)   STIPULATIONS.**

   **a)**   The following facts are stipulated:

- Destiny Clark was offered the position of Head Volleyball Coach on April 30, 2015, with a start date of May 4, 2015. Her offer letter indicated the position of Head Volleyball Coach was a full-time position, with a salary of $37,000. Ms. Clark resigned in writing from this position effective July 16, 2018.

- During her time at Newman University and the relevant time frame of this lawsuit:  Dr. Noreen Carrocci served as President of Newman University and Jennifer Gantz served as Vice President for Finance and Administration.

- In October 2017, Ms. Clark submitted a written complaint to the University's Title IX Coordinator, alleging gender-based discrimination.

   **b)**   The parties have agreed to stipulate to the authenticity of the documents produced in discovery by Defendant Newman with a bates label prefix "N-C-A".

   **c)**   The parties have stipulated to the authenticity, foundation, and admissibility of the following exhibits for purposes of summary judgment only:

- Newman Title IX Packet N-C-A00001-19

- Offer of Employment to Plaintiff N-C-A00020-21

- Hiring file of Destiny Clark – N-C-A00022-40

- Student-Athlete Exit Interviews 2016-2017 – N-C-A00060-105

- Student-Athlete Exit Interviews 2017-2018 – N-C-A00106-139

- Title IX Investigation Report – N-C-A00140-153

- Plaintiff's personnel file – N-C-A00565-584

- Newman University Student-Athlete Handbook – N-C-A00603-641

- Newman University Faculty Handbook – N-C-A000750-857

- Newman University Employee Handbook – N-C-A000884-965

- Fundamental Fitness Contract N-C-A000155-000157

- Athletic Department Handbook N-C-A027935-028030

- Email N-C-A003212-3213

- Title IX Reporting Form N-C-A003290-3293

- Job Posting N-C-A0207906-207907

3)   **FACTUAL CONTENTIONS.**

a)   **Contentions of Plaintiff.[1]**

Equal Pay Act

Ms. Clark was hired by Newman in May of 2015 as the head volleyball coach. During her interview for the volleyball coach position, Ms. Clark spent a significant portion of her interview discussing her qualifications to also become Newman's strength and conditioning coach. The pay for the volleyball coach position alone would have been less than Ms. Clark was receiving at her current position—so the second coaching job was important to Ms. Clark. Ms. Clark made it clear that she could only financially afford to move to Newman if she also received the strength and conditioning coach position. After the interview, Victor Trilli, the Athletic Director for Newman, assured Ms. Clark the strength and conditioning coach position was hers for $20,000 a year, and

---

[1] Defendant objects to the inclusion of any facts in Plaintiff's contentions which relate solely to any "new claims" as objected to below (*infra* notes 2-3) and discussed in the Court's separate order entered the same date as this Pretrial Order.

she accepted this offer. Ms. Clark was led to believe she was hired for the position and that the paperwork would be completed at a later date.

Despite being offered the strength and conditioning coach position, despite Clark's acceptance at the $20,000 rate, and despite Newman's knowledge of her reliance on this agreement, Newman never paid Ms. Clark for that position. When she requested paperwork to start being paid for the work, Trilli told Clark to just focus her efforts on being the volleyball coach. During this time, Ms. Clark provided strength and conditioning workouts for her team and assisted other sports and athletes with their strength and conditioning needs—all without being compensated for the same.

In 2016, the NCAA changed its rules, and Newman was required to hire a dedicated strength and conditioning coach. During the discussions about this change, Trilli announced to the entire athletic department that Ms. Clark would satisfy the requirements because she had the necessary certifications. Ms. Clark then approached Mr. Trilli and again asked to be paid as the strength and conditioning coach for $20,000 annually as the parties had originally agreed. Mr. Trilli laughed in Ms. Clark's face and this time offered her a $2,000 stipend. Ms. Clark declined to do the work for $2,000.

Newman hired Renaire Palmer (a lesser qualified male) for the strength and conditioning coach position for $20,000. In 2018, after Mr. Palmer left the University, Defendant posted the position through human resources and Ms. Clark applied. Her interview was rescheduled multiple times, was not attended by the Athletic Director and she received a rejection letter for that position almost immediately after her interview. The position was given to another male.

Title IX Issues

The women's volleyball team shared gym time with the men's basketball team during most of the academic year, especially when both teams were in season. Mr. Trilli had recognized issues regarding gym time long before Ms. Clark complained. In 2016, Professor McFall, a faculty member, advised Newman's Title IX Coordinator that he was aware of unofficial complaints regarding practice times given to men's and women's basketball teams with the women's team given less advantageous practice times. That investigation concluded with no action taken.

For the duration of her work at Newman, Ms. Clark struggled with the men's basketball team not vacating the gym at the end of their allotted practice time for the women's volleyball team to begin their practice. Ms. Clark brought this concern to the men's basketball coaches directly. Men's basketball continued to invade the practice time of women's volleyball for the duration of her work at Newman. When direct communications with the men's basketball coaches did not work, Ms. Clark brought her concerns to Mr. Trilli. Trilli generally dismissed the issue and forced the coaches to "work it out themselves". During other meetings, Trilli spoke down to Clark directly in front of her male counterparts advising her she needed to just get along.

Clark also repeatedly expressed concerns and complaints that she was not treated the same as male coaches—with whom she had to navigate shared gym space. Ms. Clark's annual evaluation dated 12/05/16 states "Want to feel respected by MBB program (coaches and players). Feel extremely disrespected right now and sometimes unsafe. My working environment (w/ concern to Daniel Nwosu). I often feel the disrespect for me and my program is due to me being a female coach."  Trilli read and discussed this evaluation with Ms. Clark but never investigated her complaints of gender discrimination nor did anyone from the University. Ms. Clark continued to report her frustrations to Mr. Trilli and the Assistant Athletic Directors with no change.

Another major component of Ms. Clark's Title IX complaint related to a specific male basketball student athlete, Daniel Nwuso ("Dax"). Newman failed to protect Clark from gender harassment by Daniel. Daniel routinely interrupted women's volleyball practice. Again, Ms. Clark took the concerns with this athlete to the men's basketball coaches, who had the power to control the student. Nothing changed. Ms. Clark took the concerns to the Athletic Director. Nothing changed. Trilli was aware that Daniel and Ms. Clark "could not stand each other" but Trilli did nothing to protect her from Daniel's harassment. Ms. Clark told Newman that Dax stole volleyball equipment from the team's locker area during a time he had exclusive and unsupervised access to the equipment. There was no investigation or effort to stop the harassment or allegations of theft.

Ms. Clark attempted to handle the practice interruptions by Daniel after receiving no support from his coaches or Mr. Trilli. In September 2016, the issues escalated into a screaming match during practice. Trilli "investigated" the incident. After his investigation, Trilli did nothing, Newman did nothing. No one followed up with Ms. Clark about the incident.

In the fall of 2017, Daniel continually interrupted volleyball practice.  Again, the situation escalated into an incident with him screaming at Clark, in front of her team. This time Daniel physically charged at Ms. Clark—she interpreted this as a physical threat. Daniel did not scream at or charge male coaches. Ms. Clark feared for her and others' safety. She requested that the male student be banned from volleyball games.

<u>Title IX Complaint</u>

In response to Ms. Clark expressing her fear of Daniel to Mo Floyd, the Head of Security, Floyd directed Ms. Clark to Levi Esses, Dean of Students. Mr. Esses encouraged Ms. Clark to make a Title IX complaint. Ms. Clark was advised that her complaint warranted full investigation. Ms. Clark typed her complaint, provided documents, and sent it to Mr. Bell along with Newman's

Title IX complaint form. Mr. Trilli, Mr. Allen, and Jamahl DePriest (Assistant Men's Basketball coach) were named as respondents to the complaint. Mr. Bell also banned Daniel from the DeMattias building (the offices for the Athletic Department) on Newman's campus.

Mr. Bell informed Mr. Trilli of the complaint. During this discussion, Mr. Trilli verbalized his intent to retaliate against Ms. Clark, and stated that Coach Potter (former men's basketball coach) would too. Defendant's human resources wrote Mr. Trilli up for making the statement— almost a month after Mr. Trilli made the statement. The University President adamantly opposed the decision to write up Mr. Trilli. These conversations are recorded and the witnesses are clearly heard stating illegal and retaliatory comments in violation of Newman policies and federal law. Mandy Greenfield, Director of Human Resources, acted as the Title IX coordinator on Ms. Clark's complaint. Greenfield assigned John Walker and Lisa DeLoach to investigate the complaint.

Title IX Investigation

John Walker and Lisa DeLoach began the investigation. Initially, Jo Pryor (Assistant AD, who reported directly to Trilli) was assigned as Ms. Clark's interim supervisor. Then the University assigned Levi Esses as a temporary supervisor over Dr. Carrocci's objections. (Mr. Esses filed his own Title IX retaliation claim against Victor Trilli in December 2017 and ultimately left the University completely at the end of the fall 2017 semester.)

Though Daniel was to be banned from the building that Ms. Clark worked in, the very next day Ms. Clark walked into her office to see him sitting at a computer in the common area. At that point, Ms. Clark obtained a protection from stalking order in state district court against him. Even with the stalking order, Newman's head of security informed Ms. Clark that he could not keep her safe. Rather than control Daniel, the University instructed Ms. Clark to work from home shortly

after she filed the Title IX complaint. Despite Daniel leaving the state of Kansas in December 2017, the University did not allow Ms. Clark to return to work on campus until late January 2018.

Mandy Greenfield repeatedly met with Dr. Carrocci during the internal investigation. Dr. Carrocci became antagonistic towards Ms. Clark and the investigation, saying it was taking too long, that the investigators were following every lead, and that the respondents were being treated unfairly. Dr. Carrocci stated that Daniel was treated unfairly since he was banned from the DeMattias building but that Ms. Clark was not.

Dr. Carrocci then personally hired Lewis Brisbois to take over the Title IX investigation despite the fact that Newman's internal investigation was almost complete. Defense counsel's partner, Jeremy Schrag, took over the investigation. Schrag started the investigation over. In January 2018, Schrag issued a Title IX report stating that Ms. Clark was not credible based on one recorded conversation with Clark, Potter and Allen from 2016. Schrag's report stated "conditions exist at the University which could negatively impact the University's ability to ensure an educational environment free from gender discrimination in the future," that Newman did not violate Title IX as it related to Ms. Clark's complaint. Schrag's investigation and report for Newman was misleading. The intent of this investigation was not to investigate whether any Title IX violation occurred but an attempt to prevent violations from being discovered. Schrag then recommended executive coaches mediate the relationship between Clark, Trilli, and Allen.

<u>Title VII Complaint</u>

Relying on all previously stated facts, Plaintiff filed a Title VII EEOC Charge. After being allowed to return to work in January 2018, Trilli completely ignored Ms. Clark. He did not speak to her, would not acknowledge her and did not return her emails. He memorialized his rage that

she was allowed to come back and that he had to just act like normal. Coach Allen would not speak to or acknowledge Ms. Clark. The shared gym space issues continued with men's basketball.

In February 2018, Ms. Clark filed a Title VII administrative charge with the EEOC for hostile work environment and gender discrimination. Defendant's employees' complete vitriol towards Ms. Clark for filing the Title VII is documented. Ms. Clark was disparaged by Athletic Department personnel for going against the "family".

Retaliation

From the time of filing the Title IX Complaint in October 2017 through filing of the Title VII charge in February 2018 to her constructive discharge in July 2018, Ms. Clark was harassed and retaliated against for her protected conduct. Some examples include but are not limited to: being sent to work at home while the male student was allowed to stay on campus; having to continue to work from home for weeks after the male student had left the state; Trilli intentionally ignoring the women's volleyball team (going to no games and refusing to support the program) contrary to his own customs of attending games and supporting teams; new "policies" targeted directly at Ms. Clark (requiring office hours—while she was working from home); refusal of Athletic Department support for Ms. Clark in doing her job as coach; disregard of confidentiality during the Title IX process; administrative and executive employees interfering, manipulating and controlling the investigation process; isolation and poor treatment of Ms. Clark and the volleyball team after the investigation; retaliatory and unequal treatment of the volleyball team in 2018; being re-assigned supervisors on multiple occasions; being forced to engage in personality assessments; having her employment threatened by Dr. Carrocci for the same conduct that was not even discussed with Ms. Clark prior to Ms. Clark's filing of a Title IX and VII; not being considered a serious candidate for the strength and conditioning coach position in spring 2018; generally being

ignored by management; having Ms. Clark "work with" Jennifer Gantz on her return to work issues; refusing to provide Ms. Clark with information about the harassing male student's return to campus in spring 2018 for graduation; and many other incidents, both known to Clark at the time and behind her back.

Newman employees and Ms. Clark's bosses expressed their anger (in Trilli's words at his deposition, his "rage") at Ms. Clark filing complaints. Newman employees blamed Ms. Clark's complaint for unrelated problems in the Athletic Department. Newman employees blamed Ms. Clark's complaint for dysfunction in the Newman University executive cabinet.

Due to Dr. Carrocci's frustration with the internal investigation into Ms. Clark's Title IX complaint, Newman suspended and then terminated Mandy Greenfield (Title IX Coordinator) and John Walker (Title IX Investigator). Essentially, every person that touched Ms. Clark's complaint was targeted by Newman. Defendant's conduct for the duration of Ms. Clark's employment supports the finding of malice and complete reckless indifference to Ms. Clark's federal rights.

Ms. Clark was subject to retaliatory harassment and constructive discharge for filing her Title IX complaint and then her Title VII Charge. Ms. Clark was given no other choice but to find a new job due to the extreme hostility of Newman. Ms. Clark resigned effective July, 2018.

<u>Ministerial Exception and Religious Freedom and Restoration Act</u>

Defendant asserts that Plaintiff's entire claim should be dismissed due to the affirmative defenses available under the ministerial exception and the Religious Freedom and Restoration Act. Newman University has no evidence that Ms. Clark was ever given ministerial duties and in fact the University testified she was not qualified and nor expected to give spiritual instruction to the students at Newman. Further, Newman University plainly testified that gender equality is a tenant of Newman's Code; that women are equal and valued members of the educational system and

community and that that Catholic faith holds no teaching that gender equality, Title VII or Title IX requirements are contrary to their faith's teachings.

      **b)**      **Contentions of Defendants.**

Destiny Clark was the Head Women's Volleyball Coach at Newman University from May 4, 2015, until she voluntary ended her employment with Newman University on June 27, 2018, when she notified Newman University that she accepted a position as head volleyball coach at a better ranked school, with higher pay.  This is a case of a disgruntled worker who did not like her work conditions, but such work conditions do not rise to the level of a valid claim that entitles her to damages.

The evidence in this case will support the following facts:

      1.      Newman hired Ms. Clark as a full-time volleyball coach, not a strength coach.

      2.      Ms. Clark accepted the job at Newman to use Newman as a steppingstone, with hopes to move on to a D1 or D2 college.

      3.      Mr. Trilli treated Ms. Clark with admiration and respect, even awarding her "Coach of the Year" twice during her tenure at Newman.

      4.      The reality at a small school like Newman is that funding, gym space, and other amenities for sports teams are limited – the athletic department at Newman worked cooperatively and tirelessly to schedule practices and games for all athletes.

      5.      Ms. Clark's complaints were fully investigated by outside attorneys, who ultimately found that no gender discrimination had occurred by Newman personnel.

      6.      Newman took no adverse employment action against Ms. Clark – Ms. Clark voluntarily left Newman to accept a position at a better ranked school, with higher pay.

7.     Even if successful on her claims, Ms. Clark has little to no damages.

On May 4, 2015, Newman University hired Ms. Clark as the Head Volleyball Coach with a salary of $37,000.  This was a full-time position.  When hired, Ms. Clark was promised no other position nor was she promised any salary associated with performing any other position. Ms. Clark alleges that she was offered an additional full-time position of Strength Coach when she was originally hired, and that she was offered a salary of $20,000 for that position—she was not. Ms. Clark held one full-time position while at Newman University.

Ms. Clark makes allegations that Newman University hired a male strength coach, who was less qualified than Ms. Clark, instead of hiring Ms. Clark for the position, because of her gender.  Newman denies this allegation.  She alleges she was promised the position when she was interviewed for the Head Volleyball Coach position. Newman also denies this allegation. In fact, at the time Ms. Clark was hired as the Head Volleyball Coach, Newman was not required to have (and did not have) a Strength Coach.  No promise was made to Ms. Clark regarding the strength coach position.  Over a year after Ms. Clark was hired, and once the conference required Newman to have a strength coach, Newman was formalizing its intent to hire a strength training coach.  Ms. Clark was informally approached to see if she would be interested in this position. Although she was asked whether she would be interested in the position for an additional $2,000 per month, she said she was not.  Ms. Clark testified to this at her deposition. Multiple other Newman employees will attest to this fact.  Ms. Clark testified at her deposition that it was retaliatory for Newman to ultimately hire a male for the position, although she does not know his name, his level of experience, or his qualifications.

Multiple witnesses will testify that Ms. Clark was asked whether she would be interested in the position for $2,000/month, which was consistent with her desired salary range, and the

amount ultimately offered for the position. Multiple witnesses will testify that regardless of these informal discussions (which Ms. Clark rejected) Ms. Clark was not ever promised the strength coach position, and she confirmed she was not interested when asked informally asked about it. Following this informal discussion gauging Ms. Clark's interest level in the strength coach position, Newman moved forward with assessing the needs of the new position and ultimately determined that the new position should be full-time in order to best serve the students.  As a result, in 2016, Newman created a full-time strength coach position and went through its formal hiring procedures.  Following this process, Newman hired an independent contractor to fill the newly created full-time position. Newman contracted with Renaire Palmer to oversee strength and conditioning for all 18 sports.  He is qualified for the position, has a master's degree from Wichita State University in exercise science, is a Certified Functional Strength Coach, and is certified personal trainer through the International Sports Sciences Association.  Neither his gender nor Ms. Clark's gender played any role in the hiring decision.

In October 2017, Ms. Clark submitted a written complaint to the University's Title IX Coordinator, Case Bell, alleging gender-based discrimination.  Ms. Clark alleged she had been treated differently than male coaches and that her team had not received equal treatment regarding practice times at the gym.  The very next day, the University commenced an investigation into Ms. Clark's Complaint.  Newman ultimately hired an outside law firm to complete the investigation. The law firm conducted a thorough investigation, interviewed witnesses, and reviewed relevant written materials and audio recordings.   It then provided Newman with a detailed Final Investigation Report. The Final Investigation Report details each of Ms. Clark's allegations of disparate mistreatment and details the investigation results of the same. The outside investigators found that no Newman employee violated the University's anti-discrimination and/or Title IX

policies, or otherwise engaged in conduct that rises to the level of creating an environment of discrimination based on gender.

The evidence will demonstrate that Mr. Trilli did not discriminate against Ms. Clark or her team based on gender.  In fact, Mr. Trilli named Ms. Clark "Coach of the Year" two years in a row, for the 2015 and 2016 seasons. Mr. Trilli spoke highly of Ms. Clark's coaching skills before, during, and after her baseless complaints against him. While Ms. Clark was at Newman, Mr. Trilli constantly verbalized his support of her and her team, and held himself out to do anything he could to help her and her athletes succeed. Witnesses attest that this is the type of leader Mr. Trilli was at Newman.

The outside investigators concluded that the women's volleyball team was not treated differently or less favorably than the men's basketball team. Notably, none of her student athletes filed similar complaints.  Ms. Clark complains that the women's volleyball team did not receive fair treatment regarding practice times in the gym. However, Mr. Trilli and others have explained in detail the year-to-year difficulty in having multiple sports teams and only two gyms at Newman University. Newman is not a Division 1 school with scores of funding and accommodations, like Ms. Clark was used to when she played at the University of Arkansas. The numerous emails produced in this litigation show that ALL the coaches at Newman worked tirelessly to prepare gym schedules that would accommodate the limited space and endless student scheduling conflicts. In a perfect world, each team would have their own gym. Unfortunately, that was not the case. During the October 2017 meeting between Ms. Clark and Mr. Allen, Ms. Clark acknowledged the difficulty of scheduling time in the gym between all the sports teams, and stated in essence, that she felt the University and Mr. Trilli favored the sport of basketball, including women's basketball, over the sport of volleyball. Ms. Clark included the women's basketball team

as receiving more favorable treatment, which obviates the claim that the "less favored" status applied on the basis of gender. Ms. Clark complained that the men's basketball team did not give her adequate time to set up for practice, but the evidence shows she received the additional time she wanted after speaking with the men's basketball coaches. In addition, Ms. Clark had the option of using a curtain in the gym to mitigate against noise and/or loose balls during concurrent practice with the basketball teams, an issue she complained about, but she declined to utilize this option. Ms. Clark may have been unhappy with the resources and gym space available at Newman, a small, religious institution.  But her unhappiness was not the result of disparate treatment on the basis of gender.  The evidence will show that Ms. Clark did not like her work conditions, but such work conditions do not rise to the level of a valid claim that entitles her to damages.

Ms. Clark alleges she was subject to retaliatory harassment and constructive discharge for filing her Title IX complaint and her Title VII Charge. Newman denies this allegation. The evidence will show that Ms. Clark was treated fairly and appropriately. Mr. Trilli went out of his way to help Ms. Clark. On June 27, 2018, Plaintiff voluntarily resigned from Newman, stating that she accepted a volleyball coach position with Providence College in Rhode Island. She requested and received Mr. Trilli's recommendation and assistance in procuring this position. Prior to accepting this position, on multiple occasions, Ms. Clark had discussed positions outside Newman as being more lucrative for pay.  Ms. Clark was not constructively discharged from Newman – she left Newman to move on to a higher paying position at a higher-ranked school.

Lastly, founded in 1933, Newman University is grounded in Catholic values and traditions, yet is respectful of all faith traditions. Every employee at Newman, including those in the Athletic Department, regardless of the employee's religious affiliation, is expected to conform and uphold Newman's Catholic values and Mission.  The evidence will show that after Ms. Clark resigned

from Newman to take a new job, Newman became aware that Ms. Clark's behavior as the Head Volleyball Coach did not conform to Newman's coveted values and religious mission. This after-acquired evidence is as an absolute defense to Ms. Clark's claims against Newman.

## 4) **LEGAL CLAIMS AND DEFENSES.**

### a) **Legal Claims of Plaintiff.**

Plaintiff asserts that she is entitled to recover upon the following theories:

1.      Defendant violated Plaintiff's right to work in an environment free of gender discrimination in violation of Title IX. [Count 1 of Plaintiff's Complaint.][2]

2.      Defendant failed to properly investigate the Title IX complaint brought by Destiny Clark. [Count 1 of Plaintiff's Complaint.][3]

---

[2]  Defendant's "New Claims" Objection: Defendant objects that Plaintiff's "Legal Claims" section in the Pretrial Order includes two new legal claims that were not brought in Plaintiff's Complaint. These are the following: "Defendant violated Plaintiff's right to work in an environment free of gender discrimination in violation of Title IX"; "Defendant violated Plaintiff's rights under Title IX by subjecting her to a hostile work environment"; *or* "Defendant violated Plaintiff's rights under Title VII by subjecting her to a hostile work environment." Due to the confusion created by a typographical error in Count 4 of the Complaint (ECF No. 1 at 26), it is unclear whether Plaintiff intended to bring a Title IX Hostile Work Environment claim or a Title VII Hostile Work Environment claim. Defendant argues these claims should be excluded from the Court's Pretrial Order, dismissed by the Court, and/or disposed of in favor of Defendant, because they were not alleged in Plaintiff's Complaint. Furthermore, additional facts and damages amounts added to Plaintiff's contentions and/or her damage calculations in this Pretrial Order to support and as a result of these new claims should be removed.  Plaintiff did not request, and was therefore never granted, leave from the Court to timely amend her Complaint. Plaintiff's inclusion of new, additional claims for the first time in Plaintiff's section of the Pretrial Order and misrepresentation of the claims in her Complaint is wholly inappropriate and substantially prejudices Defendant. Defendant objects to the attempt to add new claims at this stage in the proceeding because of the grave prejudice that will result. The Court does not have jurisdiction over these new claims because the claims were not brought through the Complaint or the granting of an amended complaint.

[3]  Defendant objects to the inclusion of this "claim." The statement, "Defendant failed to properly investigate the Title IX complaint brought by Destiny Clark" is not in Plaintiff's Complaint and is directly contrary to Plaintiff's representations to the Court. See page 45 and page 46 of Doc. 167, transcript of hearing.

Defendant also reasserts Defendant's "New Claims" Objection, *supra* note 2.

3.      Defendant violated Plaintiff's rights under Title IX by subjecting her to a hostile work environment.[4] [Count 1 of Plaintiff's Complaint.]

4.      Defendant illegally retaliated against Plaintiff for protected activity when she first internally complained about the illegal conditions of her employment and then when she filed a formal complaint for Title IX violations. Defendant's conduct constituted retaliatory harassment for protected activity. [Count 1 of Plaintiff's Complaint.]

5.      Defendant violated Plaintiff's right to work in an environment free of gender discrimination in violation of Title VII. [Count 5 of Plaintiff's Complaint.]

6.      Defendant violated Plaintiff's rights under Title VII by subjecting her to a hostile work environment.[5] [Count 4 of Plaintiff's Complaint.]

7.      Defendant illegally retaliated for protected activity when she first internally complained about the illegal conditions of her employment and then when she filed formal complaints for Title VII violations through the EEOC. Defendant's conduct constituted retaliatory harassment for protected activity. [Count 3 of Plaintiff's Complaint.]

8.      Once plaintiff formally filed complaints under Title VII and Title IX, Plaintiff was subjected to retaliatory harassment. The harassment was severe and pervasive so that no reasonable employee could have been expected to maintain employment under these conditions. Ultimately, the Defendant constructively discharged Plaintiff in violation of Title VII and Title IX because of her gender and in retaliation of her protected activity. [Counts 1 and 3 of Plaintiff's Complaint.]

---

[4] Defendant reasserts Defendant's "New Claims" Objection, *supra* note 2.

[5] Defendant reasserts Defendant's "New Claims" Objection, *supra* note 2.

9.      Defendant violated the Equal Pay Act by refusing to pay Plaintiff for her work as the strength and conditioning coach for Defendant. Plaintiff performed the work for free after Defendant failed to pay her the agreed upon salary for the work. When Plaintiff forced the issue, Defendant then offered her $2,000. A lesser qualified male was then hired to perform the same work for $20,000. [Count 2 of Plaintiff's Complaint.]

**b)      Defenses of Defendant.**

Newman University, Inc. asserts the following defenses:

1.  Plaintiff's Complaint fails to state a claim upon which relief may be granted. [ECF 77]

2.  Plaintiff has failed to mitigate her damages, to the extent any exist. [ECF 77]

3.  Plaintiff has not suffered any damages. [ECF 77]

4.  Plaintiff's alleged damages, to the extent any exist, are speculative and uncertain, and therefore, not compensable.

5.   Defendant denies that Plaintiff suffered any damages.  If it is subsequently determined that Plaintiff suffered damages and that Defendant is liable, Plaintiff's claims are barred or reduced by her failure to mitigate her damages. [ECF 77]

6.  Plaintiff's claims may be barred in whole or in part by the doctrine of after-acquired evidence. [ECF 77].

7.  Defendants deny committing any violation of any law, including, but not limited to, Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681; Title IV of the Higher Education Act of 1965; Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act.  [ECF 77].

8.   Defendant Newman is an equal opportunity employer that does not make employment decisions based on any protected status or activity and does not retaliate against or wrongfully discharge employees based on any protected status or activity. [ECF 77]

9.   Any damages suffered by Plaintiff, which Defendant denies, were caused in whole or in part by an intervening or superseding cause. [ECF 77]

10.  Plaintiff is not entitled to an award for pre-existing damages. [ECF 77]

11.  All actions taken by Defendant were taken for legitimate, non-discriminatory, non-retaliatory reasons. [ECF 77]

12.  Plaintiff is not entitled to any punitive damages because such damages are contrary to Defendant's good faith efforts to comply with state and federal laws.  Any such claim for punitive or exemplary damages, if granted, may be grossly excessive and in violation of the Kansas and United States Constitutions. [ECF 77]

13.  The employee who Plaintiff claims discriminated against Plaintiff, and/or took adverse action against her, is the same employee who hired Plaintiff and awarded her Coach of the Year--twice.  There was no discriminatory conduct in her hiring, and there was no discriminatory conduct during her tenure as an employee at Newman University. [ECF 77]

14.  Plaintiff's claims are barred because Defendant would have made the same employment decisions it made regarding Plaintiff regardless of any alleged discrimination. [ECF 77]

15.  Some or all of Plaintiff's claims are limited by damage caps, including but not limited to, damage caps pursuant to state law and/or Title VII. [ECF 77]

16.  Plaintiff's claims are barred, in whole or in part, by the Religious Freedom Restoration Act and/or the Ministerial Exception Doctrine.

5)   **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**[6]

Plaintiff claims:

| | | |
|---|---|---|
| Back Pay, Strength Coaching Position, 3 years | $ | 60,000.00 |
| Equal Pay Act Liquidated Damages | $ | 60,000.00 |
| Compensatory and Punitive Damages, Title VII | $ | 200,000.00 |
| Compensatory Title IX | $ | 200,000.00 |
| Punitive Damages, Title IX | $ | 300,000.00 |
| Attorney Fees / Costs through Pre-Trial (Estimated) | $ | 225,000.00 |
| TOTAL DAMAGES CLAIMED | $ | 1,045,000.00 |

6)   **AMENDMENTS TO PLEADINGS.**

There are no pending requests for Amendments to the Pleadings.

7)   **DISCOVERY.**

Pursuant to the Court's Order Granting the Parties' Joint Motion to Amend the Scheduling Order [ECF 188], general discovery closed on October 22, 2021. Discovery regarding Defendant's Freedom Restoration Act and/or the Ministerial Exception Doctrine affirmative defenses was extended until January 13, 2022. [ECF 199].  Although the undersigned U.S. Magistrate Judge reviewed a belatedly presented dispute between counsel on February 7-8, 2022, over email correspondence, the Court considers **all discovery to now be closed**.

8)   **MOTIONS.**

a)   **Pending Motions.**

There are no motions pending in front of the Court.

---

[6] [ Defendant reasserts Defendant's "New Claims" Objection, see above.]

**b)** **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

1. Defendant intends to file a motion for summary judgment, a *Daubert* motion, motions *in limine*, and other motions as appropriate in response to Plaintiff's motions.

2. Plaintiff intends file (1) Motion to Strike Errata Sheet of Victor Trilli (2) Motion to exclude or strike Defendant's Expert Peter Lake (3) Motions in Limine and (4) Motion for Summary Judgment. Plaintiff may renew her Motion to Disqualify Alan Rupe and/ or the Lewis Brisbois law firm but that has not yet been determined.

The dispositive motion deadline is **March 4, 2022**.

The parties should follow the summary judgment guidelines available on the court's website and Judge Broomes' Standing Order:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

https://www.ksd.uscourts.gov/wp-content/uploads/2018/05/attachment-1.pdf

**c)** **Motions Regarding Expert Testimony.**

All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the deadline to file dispositive motions.

**9)** **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is to be tried by jury on **October 24, 2022 at 9:00 a.m**. in Wichita Courtroom 238 before District Judge John W. Broomes. Trial is expected to take approximately 5-6 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been

decided, then the trial judge will convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions *in limine*, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**IT IS SO ORDERED**.

Dated February 11, 2022, at Wichita, Kansas.

s/ Gwynne E. Birzer
U.S. Magistrate Judge