**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DESTINY CLARK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 19-1033-KHV** |
| **NEWMAN UNIVERSITY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

Destiny Clark filed suit against her former employer Newman University, Inc. alleging that it discriminated against her on the basis of sex, maintained a hostile work environment, did not promote her because of sex and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 <u>et seq.</u>  This matter is before the Court on <u>Defendant Newman University, Inc.'s Motion For Summary Judgment</u> (Doc. #226) filed March 11, 2022 and <u>Plaintiff's Motion For Partial Summary Judgment</u> (Doc. #224) filed March 12, 2022.  For reasons stated below, the Court sustains both motions, in part.

## <u>Legal Standard</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Liberty Lobby</u>, 477 U.S. at 248.  A "genuine" factual dispute

requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251–52.

## Facts

Except as noted below, the following facts are uncontroverted or viewed in a light most favorable to plaintiff, the nonmoving party.

As a student, plaintiff played Division I volleyball at the University of Arkansas.  On

April 30, 2015, plaintiff accepted a full-time position as Head Volleyball Coach at Newman.  At that time, Victor Trilli was Athletic Director and Vice President of Student Affairs.  Trilli supervised all coaches and employees in the Athletic Department.  Trilli reported directly to Noreen Carrocci, President of Newman.

In plaintiff's first two performance evaluations, Trilli provided positive feedback.  Trilli told plaintiff that she was "big time" and the hardest working coach he had ever seen.  Trilli's feedback included student reviews, which detailed issues only involving playing time and game time decisions.  For plaintiff's first two years, Trilli, Maureen Rohleder (Assistant Associate Athletic Director) and Joanna Pryor (Associate Athletic Director) recognized plaintiff as Newman's "Coach of the Year."

When plaintiff started at Newman, Trilli met with her at least once a week, and sometimes twice.  During these meetings, Trilli discussed plaintiff's appearance, hair, child-bearing plans and dating life.  Plaintiff complained to a male co-worker about Trilli's comments and asked him to speak with Trilli.  Soon after, Trilli stopped the regular one-on-one meetings and only commented on plaintiff's appearance and dating life a couple of times a year.  Trilli did not make similar comments to plaintiff's male colleagues.  Clark Dep. (Doc. #246-2) at 104–108.

Strength Coach Position

After graduating with a degree in kinesiology and a master's degree in exercise science, plaintiff envisioned a career as a strength and conditioning coach.  Before Newman, plaintiff worked as a volleyball and strength coach at Wichita Collegiate High School.  Since 2011, plaintiff has held and maintained a Certified Strength and Conditioning Specialists ("CSCS") certification, which is one of the most respected certifications for strength coaches.

Plaintiff only applied for the volleyball coach position at Newman because it also had an

3

opening for a strength coach position.  During her interview, Trilli and plaintiff spoke at length about plaintiff's qualifications for the strength coach position.  In April of 2015, when Trilli verbally offered plaintiff the head volleyball coach position, he also offered her the strength coach position for an additional $20,000 annually.  Plaintiff accepted the offer for both positions, but Newman's written offer did not mention the strength coach position.

Beginning in 2016, the NCAA changed its rules and required Newman to hire at least one strength coach.  When plaintiff heard Trilli tell the coaching staff that Newman already had someone with an appropriate certification, she told Trilli that she did not want to be the designated strength coach without the official job title.  Trilli asked plaintiff about her expected compensation, and plaintiff responded that she wanted $20,000 annually because Trilli had offered this amount in her initial interview.  Trilli laughed at plaintiff and told her that he would pay her $2,000.  Plaintiff declined that offer.

Newman then hired Renaire Palmer as the strength coach.  Cam Clark Letter (Doc. #246-38).  Newman paid Palmer $20,000 annually for the position.  Palmer did not have a CSCS certification.  After Palmer left in 2017, Newman posted the position opening and plaintiff applied.  The hiring committee—which did not include Trilli—interviewed plaintiff but did not select her.  Newman claims that it did not hire plaintiff because she was a full-time coach and could not assume another full-time position.

Gym Space Conflicts

Because all athletic teams at Newman shared one gym, the Athletic Department had a shared calendar system that detailed practice times.  During the fall season, plaintiff was the only female coach competing for gym times with male coaches.  Plaintiff's team usually practiced after the men's basketball team, which Mark Potter coached.  Later, RJ Allen coached the men's

basketball team.  Plaintiff repeatedly complained to Potter and Allen that they took gym time from

her team.  When plaintiff raised the issue at athletic staff meetings, the men's basketball staff raised

their voices at plaintiff, interrupted her and spoke down to her—sometimes in front of Trilli.

In February of 2017, plaintiff complained to Rohleder and Trilli that the other coaches did

not use the shared calendar system.  Specifically, plaintiff reported that she had to reschedule or

cancel practices on short notice because other coaches did not timely submit their practice

schedules.  Trilli and Rohleder did not help the coaches resolve gym time conflicts.

On more than one occasion in the spring of 2018, Allen's practice ran late—cutting into

plaintiff's practice time.  Allen once went over his practice time by 32 minutes.  Plaintiff eventually

complained to Jennifer Gantz (Vice President of Finance at Newman) but Gantz did not take

corrective action.  Plaintiff finally asked Athletic Trainer Terra Macklin if she should file a Title IX

complaint.  Macklin advised plaintiff not to do so because she thought it would only worsen

plaintiff's situation.

Daniel Nwosu

In August of 2015, Daniel Nwosu, a male basketball player, began harassing volleyball

players.  For example, at 3:00 a.m. one morning, Nwosu knocked on doors of various volleyball

players and when they answered, told them that he was "looking for a wife."  Clark Timeline (Doc.

#246-20) at 2.[1]  The players—who feared Nwosu's advances—reported this incident to plaintiff.

Plaintiff reported Nwosu's conduct to Potter (Nwosu's coach), but he did not take corrective

---

[1]       Defendant objects to plaintiff's affidavit because it is self-serving.  Defendant's
Reply In Further Support Of Its Motion For Summary Judgment (Doc. #254) filed May 6, 2022 at
6.  To the extent that plaintiff's affidavit includes specific facts which set forth the basis for her
statements, the Court overrules defendant's objection.  See Lawson v. Potter, No. CIV.A. 05-2402-
KHV, 2007 WL 201121, at *2 (D. Kan. Jan. 22, 2007).  On the other hand, the Court sustains
defendant's objections to plaintiff's bald assertions, such as her general statements that defendant
harassed and discriminated against her based on sex.

action.  Nwosu also interrupted volleyball practices by shooting basketballs, making noise and hitting volleyball players with his ball.  Because Nwosu worked as a janitor in the work study program, he had access to the gym and team locker rooms after hours.

Plaintiff reported her concerns about Nwosu to the men's basketball coaches.  The coaches did not take plaintiff's concerns seriously, mocked her to her face and told her that Nwosu was "a good kid."  Plaintiff then stated her concerns to Trilli, but he also took no corrective action.

On September 1, 2016, Nwosu interrupted a volleyball practice.  Plaintiff asked Nwosu to leave, but he refused and yelled at plaintiff.  While yelling at plaintiff, Nwosu got "very, very close" to her in a physically intimidating way.  Clark Timeline (Doc. #246-20) at 6.  Plaintiff reported this incident to Trilli.  Trilli investigated the incident, but took no corrective action.

Later that month, plaintiff told Trilli that the men's basketball team did not respect her team or women.  In December of 2016, as part of her evaluation, she also stated that she wanted the men's basketball team to respect her and her players.  Plaintiff noted that she felt "extremely disrespected . . . and sometimes unsafe in [her] working environment ([with] concern to Daniel Nwosu)" and felt that the disrespect for her and the volleyball program was because she was a female coach.  Clark 2016 Performance Evaluation (Doc. #246-13) at 7.

On October 2, 2017, Nwosu again interrupted a volleyball practice.  When plaintiff asked him to leave, Nwosu repeatedly screamed at her.  Plaintiff immediately went to Trilli and explained that she felt "completely powerless and unsafe in [her] work environment."  Plaintiff also reported her concerns to Mo Floyd, Head of Security, and asked Newman to ban Nwosu from volleyball games.

The following day, Newman banned Nwosu from the athletic building.  When Case Bell, the Title IX coordinator at Newman, informed Nwosu that he could not go to the building, Nwosu

became very upset, used vulgarities and said that he should have "pounded" plaintiff when he had the chance.  Esses Title IX Docs. (Doc. #246-23) at 10.  Plaintiff continued to encounter Nwosu in the building.  Plaintiff asked Trilli to remove Nwosu, but he refused to do so.

On November 20, 2017, in Sedgwick County District Court, plaintiff filed a protection from stalking action against Nwosu.  In her complaint, plaintiff identified the incidents on September 1, 2016 and October 2, 2017.  The state court judge entered a temporary restraining order ("TRO") that day, which prohibited Nwosu from approaching plaintiff or entering the athletic buildings at Newman.  The order expired on January 18, 2018.

Title IX Complaint And Investigation

After the October 2, 2017 incident with Nwosu, Floyd directed plaintiff to Levi Esses, Dean of Students, to discuss her safety concerns.  Esses referred plaintiff to Bell, who said that the matter warranted a full investigation.  Plaintiff sent Bell a Title IX complaint and various documents including a ten-page, single-spaced timeline of the alleged discriminatory events.  In her complaint, plaintiff accused Trilli, Allen and Jamahl DePriest, the assistant men's basketball coach, of discrimination because of sex and retaliation in violation of Title IX.

The day after plaintiff filed her complaint, Newman commenced an investigation.  Mandy Greenfield, head of Human Resources, believed that she should lead the investigation, while Bell believed that he should oversee the investigation.  At first, John Walker, Director of the Counseling Program, and Lisa DeLoach, a Human Resources Employment Specialist, led the investigation.  Ultimately, outside counsel completed the investigation.

On October 4, 2017, Bell and Greenfield spoke with Trilli about the complaint and recorded the conversation.  Bell advised Trilli of Newman's prohibition against retaliation.  Bell told Trilli that he needed "to be really careful about retaliation issues."  Trilli responded, "Oh I

would, I would, I tell you right now, I would.  And so would Coach Potter, from the outside, but fine."  Carrocci did not want to discipline Trilli for stating that he would retaliate against plaintiff.  At the direction of counsel, however, Carrocci and Greenfield met with Trilli and asked him to sign a letter drafted by defendant's attorney.  The letter stated that Trilli understood he could not retaliate against plaintiff in any way.  Trilli reluctantly signed the letter.  Trilli did not deny his comments regarding retaliation or state that Greenfield misunderstood him.[2]  Even so, Newman did not discipline Trilli.

At the beginning of the Title IX investigation, Newman assigned Pryor as plaintiff's interim supervisor.  Plaintiff objected that Pryor reported to Trilli, so Esses acted as plaintiff's temporary supervisor over Carrocci's objections.  On October 6, 2017, Bell sent a "Notice of Investigation" to Trilli, Allen and DePriest.  The notice detailed the allegations in plaintiff's Title IX complaint.  Bell advised Trilli, Allen and DePriest that Nwosu could not enter the athletic buildings at any time, with no exceptions.  Further, Bell (1) stated that they had "the right to discuss this matter with [their] advisors and others, but the university was required under federal law to conduct this investigation confidentially;" (2) asked "for [their] discretion in what [they] choose to share;" (3) hoped "that [they would] respect the private and sensitive nature of these allegations" and (4) explained that Newman could not retaliate against a person who participated in protected activity, including individuals who made a good faith Title IX complaint.

In November of 2017, Walker told plaintiff to work from home because security staff could not guarantee her safety from Nwosu, who remained on campus.  Plaintiff could not return to campus until January 17, 2018, when the Executive Committee "invited" her back.  Shortly after

---

[2]      Trilli later testified that he made the comments in a state of rage and meant that he would do everything he could not to retaliate.  Trilli Dep. (Doc. #246-6) at 299.

plaintiff filed her Title IX complaint, Newman instituted new policies requiring that staff conduct office hours and in-person meetings. Plaintiff purportedly had to abide by these policies even though she was working from home.

On November 30, 2017, Newman retained the law firm of Lewis Brisbois to complete the Title IX investigation. Carrocci believed that the investigation had "really gone amuck in some form," and an executive committee member of the board advised Carrocci to contact an attorney. Carrocci Dep. (Doc. #246-14) at 15. Carrocci believed that Walker and DeLoach were not working quickly enough and were treating Trilli, Allen and DePriest unfairly. Carrocci did not know the specifics of plaintiff's complaint, but she thought that the complaint could not be "that complex." Id. at 153–154. Carrocci also believed that Newman had unfairly banned Nwosu from the athletic buildings. Ultimately, Jeremy Schrag, a partner at Lewis Brisbois, oversaw the investigation.

In December of 2017, Esses filed his own Title IX retaliation claim against Trilli and left Newman. Esses alleged that from October through December, Trilli had repeatedly sought confidential information about plaintiff's Title IX investigation. During this same period, Trilli had also asked Carrocci about the status of the investigation.

On January 16, 2018, Schrag issued a report, which concluded that none of the respondents had violated Newman's Title IX policy. Schrag set aside all interim actions—except Nwosu's building ban—and stated that Newman should take remedial action to avoid potential retaliation claims. Schrag found that "conditions exist at the University which could negatively impact the University's ability to ensure an educational environment free from gender discrimination in the future." Schrag suggested that Newman obtain an outside counselor to help with the relationship between plaintiff and respondents.

<u>Post-Title IX Investigation And EEOC Charge of February 2018</u>

When plaintiff returned to campus in January of 2018, Trilli emailed Carrocci stating that plaintiff's decisions had devastated the athletic department and that his coaches and their families had struggled through a nightmare. Trilli complained about the timing of the administration's decision to bring plaintiff back to campus. Trilli stated that he wished someone had consulted him and his staff before extending an invitation for plaintiff to return. After plaintiff returned to work, Trilli and Allen would not speak to her or respond to her emails. In addition, the gym space issues with Allen continued.

Newman required plaintiff and Trilli to attend sessions with a counselor, Aaron Decker, to facilitate a working relationship. Decker required plaintiff to take personality assessments. He did not keep these assessments confidential and shared them with Trilli. On at least two occasions, Trilli attended the counseling session with plaintiff.

Plaintiff repeatedly asked for her 2017 performance evaluation, but Trilli refused to evaluate her. On April 6, 2018, Rohleder emailed Carrocci to complain about plaintiff. Specifically, Rohleder stated that plaintiff was not a "good fit for the Newman family," was not a team player and that her "actions and complaints [were] inappropriate and inexcusable." Rohleder complained that plaintiff's Title IX action against Trilli and the men's basketball coaches was "out of line" and that it was sad that they could not work out a compromise. Rohleder also noted that she thought it was sad that Newman had paid plaintiff to work from home unnecessarily for several months. Similarly, in an email on May 24, 2018, Trilli told Carrocci that "all of this crap" with Potter, Allen, plaintiff and [him], and the Title IX issue, had taken its toll "big time" on athletic department employees. Carrocci took no corrective action against Trilli or Rohleder for their comments about plaintiff and her Title IX complaint.

After plaintiff returned to campus, the athletic department stopped supporting plaintiff with NCAA compliance issues.  Similarly, the athletic department undermined plaintiff's attempt to have Newman host a volleyball tournament.  Only a few days before the tournament, Rohleder told plaintiff that she needed to move the tournament to the local high school.  Plaintiff believed that this was an attempt to damage her professional reputation.  In another instance at the beginning of the 2018 season, Newman told the freshman volleyball players that they could not play in a volleyball tournament because they could not miss freshman orientation.  In the past, Newman had allowed student athletes to miss class, or school activities like orientation, for competitions.  This was the first time Newman had told plaintiff's players that they could not miss class.  The new policy only affected women's volleyball.  Ultimately, the volleyball team had to withdraw from the tournament.

On February 6, 2018, plaintiff filed a Title VII charge with the Equal Employment Opportunity Commission alleging hostile work environment, gender discrimination and retaliation.

<u>Resignation</u>

In a letter to Trilli dated June 27, 2018, plaintiff resigned.  Plaintiff stated that effective July 16, 2018, she would leave her position because she had accepted an assistant coaching position at Providence College in Rhode Island.  Plaintiff testified that she left Newman because it did not want her there and made her working conditions too miserable for her to stay.  Plaintiff did not believe that she could cultivate a successful career at Newman.

<u>Religious Duties And Expectations At Newman</u>

Newman is a Catholic liberal arts university.  Newman employees need not be Catholic. The Newman Student Athlete Handbook (the "Handbook") outlines duties and responsibilities for

all university personnel.  The Handbook existed when plaintiff worked at Newman.  In relevant

part, the Handbook states that "[t]he purpose of athletics at Newman University is to provide

opportunities for students to compete in intercollegiate sports in an educationally sound

environment.  The athletics program is properly administered when its policies and procedures are

in keeping with the institution's Catholic mission and liberal arts tradition."  Newman Handbook

(Doc. #225-6) at 5.

Only theology faculty members can teach Catholic doctrine at Newman.  Newman does

not require its coaches to pray with athletes or perform any other faith-based conduct.  Its Head

Volleyball Coach job description outlined plaintiff's duties.  Theses duties included (1) planning,

organizing, directing, evaluating and administering all aspects of the women's volleyball program;

(2) coaching and managing Division II women's volleyball; (3) recruiting and retaining qualified

Division II student athletes; (4) working within Division II, Heartland Conference rules and

regulations; (5) monitoring eligibility of student athletes; (6) managing the program budget; (7)

scheduling and conducting practice to ensure physically prepared athletes; (8) arranging a

competitive game schedule; (9) hiring, training and supervising an assistant volleyball coach; (10)

promoting the health and safety of athletes and (11) complying with Division II documentation

requirements.  The description states that defendant expects employees "to exhibit a high degree

of personal integrity in support of the University's Mission."  Newman Volleyball Coach

Description (Doc. #225-7) at 1–2.

During plaintiff's initial interview, Newman's hiring committee did not ask about her

religious beliefs, practices or religious training.  According to plaintiff, she did not receive any

formal orientation, religious training or information regarding religious expectations at Newman.

On the other hand, defendant's interrogatory responses indicate that plaintiff attended a "religious

Mission orientation session" with Sister Charlotte (an employee at Newman and Sister of the Adorers of the Blood of Christ). Newman's Answer To Pl.'s Second Interrog. (Doc. #245-3) at 9.[3] Defendant contends that Trilli also provided plaintiff with instruction on its religious mission. Plaintiff rebuts this contention—insisting that Trilli never indicated that he, or anyone else as Newman, expected plaintiff to perform religious functions. Plaintiff did not perform any religious function or attend any religious events with her team at Newman. Plaintiff did not speak about religion with her team. Defendant does not rebut plaintiff's assertions about her job performance, but asserts that it expected plaintiff to carry out its mission and Catholic values.

Procedural History

On February 14, 2019, plaintiff filed this action against Newman. Under Title VII and Title IX, plaintiff alleges that Newman discriminated against her based on sex, maintained a hostile work environment and retaliated for her informal complaints of sex discrimination and the filing of her Title IX complaint. Pretrial Order (Doc. #209) filed February 11, 2022 at 16–17. Newman asserts that it is entitled to summary judgment on each of plaintiff's claims.[4]

---

[3]    Plaintiff objects to defendant's interrogatory responses because Dr. Kathleen Jagger (current President of Newman) testified that she did not have personal knowledge of every fact included in the responses. Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment (Doc. 246) at 8. Fed. R. Civ. P. 33(a)(1) states that "any officer or agent, who must furnish the information available to the party," may sign interrogatories for corporate parties. Accordingly, Federal Rule of Civil Procedure 33(a) expressly permits a corporate agent to verify the corporation's answers without personal knowledge of every response. See, e.g., General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1210 (8th Cir. 1973). Here, Jagger answered the interrogatories on behalf of defendant. Jagger need not have personal knowledge of the information. Plaintiff's objection is therefore overruled, and the Court can consider Jagger's interrogatory responses.

[4]    Plaintiff also asserted an Equal Pay Act claim, but she concedes that defendant is entitled to summary judgment on that claim. Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment (Doc. #246) filed April 15, 2022 at 26. The Court therefore sustains defendant's motion in this regard.

<u>**Analysis**</u>

Defendant seeks summary judgment on each of plaintiff's remaining claims.  Alternatively, defendant argues that it is entitled to summary judgment because the Religious Freedom and Restoration Act, 42 U.S.C. § 2000bb <u>et seq</u>., ("RFRA") and the ministerial exception bar plaintiff's claims.  Finally, defendant argues that Title IX and the "good faith exception" bar punitive damage recovery.  Plaintiff has filed a cross motion for summary judgment on defendant's RFRA and ministerial exception defenses.  Plaintiff argues that (1) RFRA does not apply to suits between private parties and (2) the ministerial exception does not apply because plaintiff did not perform religious job duties.

## I.    **Hostile Work Environment**

To succeed on a claim of hostile work environment, plaintiff must show that (1) defendant discriminated against her on the basis of sex and (2) the discrimination was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986) (internal quotations omitted).

Plaintiff alleges that Trilli and Nwosu created a hostile work environment under Title IX and Title VII.  Defendant argues that it is entitled to summary judgment because (1) its conduct was not based on plaintiff's sex and (2) any purported harassment was not severe or pervasive.

### A.    **Based On Sex**

To establish that harassment was based on sex, plaintiff may rely on facially sex-based or facially sex-neutral conduct.  <u>Throupe v. Univ. of Denver</u>, 988 F.3d 1243, 1251 (10th Cir. 2021).  Even so, the facially sex-neutral conduct must exist in the context of other, overtly gender-discriminatory conduct.  <u>Id.</u>  Ultimately, the Court must determine if a jury could reasonably infer

that defendant's conduct was related to plaintiff's sex.  Id.

Defendant argues that any alleged harassment was not based on plaintiff's status as a female.  Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #254) filed May 6, 2022 at 19.  Plaintiff has presented evidence that (1) Trilli spoke to her about her appearance, hair, dating life and childbearing plans; (2) Trilli did not have these conversations with male employees and (3) Nwosu yelled at plaintiff but did not yell at or otherwise verbally assault male coaches.  Viewed in the light most favorable to plaintiff, a jury could reasonably infer that plaintiff's sex motivated the harassing conduct of Trilli and Nwosu.  See Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007) (fact that harasser treats men and women differently in workplace sufficient to show conduct based on sex). The Court therefore overrules defendant's motion on this ground.

### B.      Sufficiently Severe or Pervasive

To establish that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, plaintiff must show that the environment was both objectively and subjectively hostile.  Jones v. Rent-A-Center, Inc., 240 F. Supp. 2d 1167, 1181 (D. Kan. 2002).  To determine whether a work environment is sufficiently hostile, the Court examines the frequency and severity of the conduct, whether it was threatening or humiliating and whether it interfered with plaintiff's work performance.  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  Whether conduct was sufficiently pervasive or severe is a quintessential question of fact that is particularly unsuited for summary judgment.  Jones, 240 F. Supp. 2d at 1182–83.

Newman argues that plaintiff experienced "simple teasing, offhand comments and isolated incidents" that as a matter of law were neither severe nor pervasive.  Memorandum In Support Of

Defendant's Motion For Summary Judgment (Doc. #227) filed March 11, 2022 at 35.  Plaintiff has presented evidence that (1) Trilli made highly personal comments to plaintiff about her appearance, dating life, plans for children and hair; (2) plaintiff's male colleagues raised their voices, interrupted her and spoke down to her at meetings; (3) Trilli did not address the inappropriate behavior of male colleagues even though plaintiff repeatedly sought help; (4) after plaintiff filed a Title IX complaint, Trilli and the men's basketball coaches refused to speak to plaintiff or answer her emails, which made it impossible for her to do her job; (5) on at least two occasions, Nwosu yelled at plaintiff and, on one occasion, physically charged at her and (6) Trilli did not address Nwosu's inappropriate conduct—ultimately leading plaintiff to obtain a TRO against Nwosu.

Viewing the evidence in the aggregate and in the light most favorable to plaintiff, plaintiff has established a genuine issue of material fact whether the conduct of Trilli and Nwosu was so severe or pervasive to alter the conditions of her employment and create an abusive working environment.  See Throupe, 988 F.3d at 1255 (in evaluating hostile work environment claim, isolated incidents viewed in aggregate).

The Court therefore overrules defendant's motion for summary judgment on plaintiff's hostile work environment claims under Title VII and Title IX.

## II.    Gender Discrimination

Plaintiff claims that defendant discriminated against her on the basis of sex because it did not hire her for the strength coach position.  Plaintiff may establish that defendant acted with discriminatory intent under Title VII either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973).  See Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278–79

(10th Cir. 2010); see also Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). Here, plaintiff relies on the indirect method of proving discrimination.

Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008). If plaintiff satisfies her burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment. McDonnell Douglas, 411 U.S. at 802–03. If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether the proffered reason is pretextual, i.e. unworthy of belief. Sanders, 544 F.3d at 1105. To do this, plaintiff can show weakness, implausibility, inconsistency, incoherency or contradiction in defendant's proffered reasons. Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Defendant does not dispute that plaintiff can establish a prima facie case of discrimination. Defendant states that it did not hire plaintiff as the strength coach in the summer of 2017 because she could not hold two full-time positions. Memorandum In Support Of Defendant's Motion For Summary Judgment (Doc. #227) at 17. Because defendant has offered a legitimate, nondiscriminatory reason for its failure to hire plaintiff, she must show that the stated reason is a pretext for sex discrimination.

Plaintiff has presented evidence that when she was initially hired as volleyball coach, Trilli verbally offered her the strength coach position with an additional salary of $20,000 annually. For some unstated reason, Newman did not include the strength coach position in her final written offer. When plaintiff reapplied for the strength coach job in 2016, Trilli laughed in her face and

dismissed her as a serious candidate for the job.  Viewing the evidence in the light most favorable to plaintiff, Trilli initially found that plaintiff was qualified for the strength job and never mentioned that the same person could not hold both the volleyball coach and strength coach positions.  From this evidence, plaintiff has established a genuine issue of material fact whether defendant's stated reason for not hiring her for the strength coach position in 2017 was pretextual. The Court therefore overrules defendant's motion for summary judgment on plaintiff's disparate treatment claim.

## III.     Retaliation

Title VII prohibits retaliation against an employee because she has "opposed" an unlawful practice under Title VII or because she made a charge, assisted or participated in an investigation, proceeding or hearing under Title VII.  42 U.S.C. § 2000e-3(a); Salemi v. Colo. Pub. Emps. Ret. Ass'n, 747 F. App'x 675, 695 (10th Cir. 2018).  Similarly, Title IX "prohibits retaliation against individuals because they have complained of sex discrimination."  Hiatt v. Colorado Seminary, 858 F.3d 1307, 1315 (10th Cir. 2017) (citing Jackson v. Birmingham Bd. Of Educ., 544 U.S. 167, 183 (2005)).  When a petitioner offers indirect evidence to support Title IX and Title VII retaliation claims, the Court once again applies the McDonnell Douglas framework.  Id.

## A.     Prima Facie Case

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) she suffered a materially adverse action and (3) a causal nexus exists between her opposition to sex discrimination and defendant's conduct.  Payan v. UPS, 905 F.3d 1162, 1172 (10th Cir. 2018).  Plaintiff's burden to establish a prima facie case is not onerous.  Texas Dept. of Comm. Affs. v. Burdine, 450 U.S. 248, 253 (1981); see also Bird v. West Valley City, 832 F.3d 1188, 1200–01 (10th Cir. 2016) (burden is light).  Defendant argues that

plaintiff cannot establish the second or third elements.

### 1.     Materially Adverse Action

A plaintiff must show that the challenged action was materially adverse, <u>i.e.</u> it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  <u>See Burlington N. Santa Fe Ry Co. v. White</u>, 548 U.S. 53, 68 (2006).  Retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of a retaliation claim. <u>Gunnell v. Utah Valley State Coll.</u>, 152 F.3d 1253, 1264 (10th Cir. 1998).  "Petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination."  <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 742 (10th Cir. 2006).  Deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings. <u>Semsroth v. City of Wichita</u>, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

Plaintiff claims that she suffered materially adverse employment action because defendant engaged in retaliatory harassment.  In support, plaintiff has presented evidence—included to a large extent above to show a hostile work environment—that (1) Trilli's words detailed his "rage" and intent to retaliate; (2) defendant required plaintiff to work from home for two months, while it simultaneously required all employees to institute mandatory office hours and attend meetings in person; (3) Trilli, Allen and DePriest refused to speak to plaintiff or respond to her emails; (4) defendant relocated the home volleyball tournament days before its commencement— damaging plaintiff's professional reputation; (5) defendant instituted a new requirement that players attend orientation, which only affected plaintiff's team and forced them to withdrawal from an important tournament at the last minute; (6) defendant stopped supporting plaintiff with NCAA compliance issues and (7) defendant mandated that plaintiff take nonconfidential personality tests

and shared the results with Trilli.  For purposes of establishing a prima facie case, plaintiff has presented sufficient evidence that these acts, when considered in the aggregate, rise to the level of a materially adverse action.  The Court therefore overrules defendant's motion on this ground.

### 2.    Causal Connection

A plaintiff may demonstrate a causal connection "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004).  However, "unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity."  Id.  A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.  Id.; see Hanson v. Colo. Judicial Dep't, 564 F. App'x 916, 920 (10th Cir. 2014) (four month period between complaint and termination too protracted to infer causation).

Here, the harassment by Trilli, Allen, DePriest and Carrocci began or increased less than a month after plaintiff filed her Title IX complaint and continued until she resigned.  For purposes of establishing a prima facie case through temporal proximity, plaintiff has presented sufficient evidence of a causal connection between her protected activity and the alleged harassment.  The Court therefore overrules defendant's motion on this ground.

### B.    Nondiscriminatory Reasons And Pretext

Because plaintiff has established a prima facie case, the burden shifts to defendant to provide legitimate, nondiscriminatory reasons for the adverse action.  Berry v. Stevison Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996).  Defendant has offered a non-discriminatory reason for only one of the purported acts of harassment.  Specifically, defendant states that it allowed plaintiff to

work from home so she could get away from Nwosu.  <u>Memorandum In Support Of Defendant's Motion For Summary Judgment</u> (Doc. #227) at 33.  Defendant's stated reason does not address the relevant "adverse action" for purposes of plaintiff's retaliatory harassment claim, <u>i.e.</u> the totality of defendant's conduct after she complained of discrimination and filed a Title IX complaint.  For example, defendant does not explain why Trilli, Allen and DePriest refused to speak to plaintiff or to respond to her emails.  In addition, defendant does not explain why it stopped allowing student athletes to miss orientation or why it stopped supporting plaintiff with NCAA compliance issues.  Even though defendant's burden is light, it has not offered legitimate, nondiscriminatory reasons for the totality of its conduct following plaintiff's complaints of discrimination.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's retaliatory harassment claim.

## IV.    Constructive Discharge

As part of her showing of adverse employment action and as an element of damages on her hostile work environment and retaliatory harassment claims, plaintiff alleges that defendant constructively discharged her.[5]  Defendant argues that it is entitled to summary judgment on this

---

[5]     The Court notes that in their memoranda on defendant's motion for summary judgment, the parties essentially treat plaintiff's constructive discharge theory as an independent claim for relief.  Because the pretrial order does not assert plaintiff's constructive discharge as a separate claim and constructive discharge ordinarily is not an independent claim, the Court only considers plaintiff's constructive discharge theory as it pertains to adverse employment action and as an element of her damages.  See <u>Thompson v. Adams Cnty. Sch. Dist. 50</u>, No. 17-CV-3147-WJM-NYW, 2018 WL 5619336, at *4 (D. Colo. Oct. 30, 2018) (constructive discharge allegations may show adverse action under ADA, but they do not constitute separate claim for relief); <u>Duckett v. Water D. One of Johnson Cnty.</u>, No. 07-2376-JAR, 2009 WL 10708342, at *15 n.68 (D. Kan. Feb. 26, 2009) (constructive discharge cannot constitute an independent cause of action, but must be supported by some underlying Title VII violation, such as disparate treatment, hostile work environment or retaliation); <u>Smith v. Turner Unified Sch. Dist. No. 202</u>, No. CIV.A. 03-2516-KHV, 2004 WL 2607553, at *5 (D. Kan. Nov. 16, 2004) (plaintiff's allegation of constructive discharge only relevant to damages—if any—which plaintiff suffered because defendant reassigned him).

theory because plaintiff voluntarily resigned her position.

To establish constructive discharge, a Title VII plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."   Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1174 n.19 (10th Cir. 2007) (quoting Penn. State Police v. Suders, 542 U.S. 129, 147 (2004)); see also Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004) ("Working conditions must be so severe that the plaintiff simply had no choice but to quit."). Plaintiff's burden in a constructive discharge case is substantial because she must show that the working conditions imposed by the employer were not only tangible and adverse, but intolerable. EEOC v. PVNF, LLC, 487 F.3d 790, 805 (10th Cir. 2007).   "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions."   Tran v. Trs. of State Colls., 355 F.3d 1263, 1270 (10th Cir. 2004).

Based on the evidence presented above on plaintiff's claims for hostile work environment and retaliatory harassment, plaintiff has established a genuine issue of material fact whether her working conditions were so intolerable that she had no choice but to quit.   The Court therefore overrules defendant's motion for summary judgment on this ground.

## V.   Defenses

Defendant seeks summary judgment on four of its affirmative defenses: (1) Title IX does not permit recovery of punitive damages, (2) Title VII does not permit recovery of punitive

---

In the pretrial order, plaintiff only alleges constructive discharge in her claim for retaliatory harassment.   See Pretrial Order (Doc. #209) at 17 (citing Counts 1 and 3 of Complaint, which are plaintiff's claims for retaliatory harassment).   Even so, because the same facts largely support both plaintiff's hostile work environment claim and her retaliatory harassment claim, the Court construes the pretrial order as asserting a constructive discharge theory in support of damages for both claims.

damages because defendant acted in good faith, (3) RFRA and (4) the ministerial exception. Plaintiff filed a cross motion for summary judgment on defendant's RFRA and ministerial exception defenses.

### A.    Punitive Damages Under Title IX

Defendant argues that plaintiff may not recover punitive damages under Title IX.  Neither the Tenth Circuit nor the United States Supreme Court have addressed whether a plaintiff may recover punitive damages under Title IX.  Even so, the Court predicts that the Tenth Circuit would follow the reasoning of other courts, which have held that because Title VI of the Civil Rights Act of 1964 does not permit recovery of punitive damages, the same rule should apply under Title IX. See, e.g., Mercer v. Duke Univ., 401 F.3d 199, 202 (4th Cir. 2005) ("Because Title IX is interpreted consistently with Title VI, the Supreme Court's decision in Barnes compelled us to vacate Mercer's punitive damage award." (citation omitted)); Roof v. New Castle Pub. Sch., No. CIV-14-1123-HE, 2015 WL 1040373, at *5 (W.D. Okla. Mar. 10, 2015) (punitive damages unavailable under Title IX because the Court "has generally interpreted Title IX consistently with Title VI . . . and the rationale for its determination, rooted in Congress' spending power, appear equally applicable to a Title IX case"); see also Barnes v. Gorman, 536 U.S. 181, 189 (2002) (punitive damages not available under Title VI).  The Court therefore sustains defendant's motion for summary judgment as to plaintiff's claim for punitive damages under Title IX.

### B.    Good Faith Defense

Defendant asserts that it is entitled to summary judgment on the issue of punitive damages under Title VII because plaintiff cannot show that defendant acted with malice or reckless indifference to her federally protected rights.  Memorandum In Support Of Defendant's Motion For Summary Judgment (Doc. #227) at 40.  A Title VII plaintiff is entitled to punitive damages if

her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1).  "Malice" or "reckless indifference" do not require "a showing of egregious or outrageous" conduct, but instead require proof that the employer acted "in the face of a perceived risk that its actions [would] violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535–36 (1999).

Plaintiff has presented sufficient evidence to establish a genuine issue of material fact whether Carrocci and Trilli acted with malice and reckless indifference in response to her complaint of sex discrimination.  For example, audio recordings reflect Trilli's "rage" and intent to retaliate after plaintiff filed her Title IX complaint.  In addition, Carrocci condoned Trilli's conduct.  The Court therefore overrules defendant's motion as to plaintiff's claim for punitive damages under Title VII.

## C.    RFRA

RFRA prohibits "[g]overnment" from "substantially burden[ing]" a person's exercise of religion unless the government can demonstrate the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1.  Defendant seeks summary judgment because enforcement of Title IX and Title VII infringe upon its free exercise rights under RFRA.  Plaintiff seeks summary judgment because she asserts that RFRA does not apply to suits between private parties.

The Tenth Circuit has not addressed whether RFRA applies in suits by private parties seeking to enforce federal law against other private parties.  Even so, the Sixth, Seventh and Ninth Circuits have held that RFRA does not apply in suits between private parties.  General Conference Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the

24

statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."); Listecki v. Official Comm. of Unsecured Creditors, 780 F.3d 731, 736 (7th Cir. 2015) ("RFRA is not applicable in cases where the government is not a party."); Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1121 (9th Cir. 2000) ("It seems unlikely that the government action Congress envisioned in adopting RFRA included the protection of intellectual property rights against unauthorized appropriation."); Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 834, 837–43 (9th Cir. 1999) (noting that Congress did not specify that RFRA applies to nongovernmental actors, as it typically does when intending to regulate private parties, and holding that private parties, acting alone, are not state actors under RFRA).

To support its argument that RFRA applies to lawsuits between private parties when a government agency could act instead of a private party, defendant relies on Hankins v. Lyght, 441 F.3d 96, 103–04 (2d Cir. 2006) (applying RFRA because federal statute at issue (ADEA) was enforceable by government agency (EEOC)).  While the Second Circuit has not overruled Hankins, a subsequent panel later questioned its conclusion.  Rweyemamu v. Cote, 520 F.3d 198, 203 n.2 (2d Cir. 2008) (RFRA should not apply to purely private disputes "regardless of whether the government is capable of enforcing the statute at issue").

The Court predicts that the Tenth Circuit would find that RFRA does not apply to suits between private parties and would follow the reasoning of then-Judge Sonia Sotomayor, who dissented in Hankins and concluded that RFRA "does not apply to disputes between private parties." Id. at 109.  First, the text of RFRA demonstrates that Congress intended RFRA to apply only to suits with a governmental party.  Section 2000bb-1(c) provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim

or defense in a judicial proceeding and obtain appropriate relief against a <u>government</u>."  <u>Id.</u>

(emphasis added).  Similarly, Section 2000bb-1(b) states that where a law substantially burdens

religion, the "government" must "demonstrate[] . . . that application of the burden" is the least

restrictive means of furthering a compelling government interest.  <u>Id.</u> (emphasis added).  RFRA

defines "demonstrate" as "meet[ing] the burdens of going forward with the evidence and of

persuasion."  42 U.S.C. § 2000bb–2(3).  As a member of the Second Circuit Court of Appeals,

Judge Sotomayor reasoned that "[w]here, as here, the government is not a party, it cannot 'go[]

forward' with any evidence," so "this provision strongly suggests that Congress did not intend

RFRA to apply in suits between private parties."  <u>Hankins</u>, 441 F.3d at 115 (Sotomayor, J.,

dissenting).[6]  Finally, in the findings and purposes section of RFRA, Congress only references

"government" action and "governmental interest." <u>See</u> 42 U.S.C. §§ 2000bb(a), 2000bb(b).

Even more, RFRA's legislative history reinforces the conclusion that Congress did not

intend for RFRA to apply against private parties.  <u>Hankins</u>, 441 F.3d at 115 n.9 (Sotomayor, J.,

dissenting) ("All of the examples cited in the Senate and House Reports on RFRA involve actual

or hypothetical lawsuits in which the government is a party.  <u>See</u> S.Rep. No. 103–111 [1993

U.S.C.C.A.N. 1892] (1993); H.R. Rep. 103–88 (1993).").

In sum, the Court holds that RFRA does not provide an alternative defense in lawsuits

between private parties.  It therefore overrules defendant's motion for summary judgment on its

RFRA defense and sustains plaintiff's motion for partial summary judgment on defendant's RFRA

defense.

---

[6]      The Court notes that RFRA's "applicability" section states that the statute applies
"to all Federal law." 42 U.S.C. § 2000bb–3.  However, Judge Sotomayor concluded that "[r]ead
in conjunction with the rest of the statute, the provision simply requires courts to apply RFRA 'to
all Federal law' in any lawsuit to which the government is a party."  <u>Hankins</u>, 441 F.3d at 115
(Sotomayor, J., dissenting).  The Court agrees.

### D.      Ministerial Exception

Defendant argues that the ministerial exception immunizes it from liability for religious-based employment decisions.  Plaintiff argues that the ministerial exception does not apply because she did not perform religious duties at Newman.

The ministerial exception forecloses "certain employment discrimination claims brought against religious organizations."   Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171, 188 (2012).  However, the ministerial exception only applies to certain positions at religious institutions.  Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2063 (2020).  When determining whether the ministerial exception applies, "[w]hat matters, at bottom, is what an employee does."  Id. at 2064.  For example, in Hosanna-Tabor, the exception applied because defendant provided religious training to plaintiff, gave her the title "minister" and entrusted her with the responsibility of "transmitting the Lutheran faith to the next generation." 565 U.S. at 192.  Similarly, in Morrissey-Berru, the Court applied the  exception because plaintiffs were "responsible for providing instruction in all subjects, including religion, . . . [and] were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith."  140 S. Ct. at 2066.

Defendant argues that it expected plaintiff to carry out its mission and Catholic values, and that the ministerial exception therefore bars plaintiff's claims.  To support this claim, defendant cites affidavits, which detail plaintiff's religious training.  Plaintiff contests these affidavits and states that defendant did not provide her any religious training.  In addition, plaintiff asserts that defendant did not assign her any religious job duties.  To determine whether defendant entrusted plaintiff with the responsibility of transmitting the Catholic faith, a jury will have to weigh the relative credibility of the witnesses.  On a motion for summary judgment, the Court cannot engage

in that task.  Therefore, the Court overrules defendant's motion for summary judgment on its ministerial exception defense.  The Court also overrules plaintiff's motion for partial summary judgement on defendant's ministerial exception defense.

**IT IS THEREFORE ORDERED** that <u>Defendant Newman University's Motion For Summary Judgment</u> (Doc. #226) filed March 11, 2022 is **SUSTAINED as to plaintiff's claim under the Equal Pay Act.  The Court otherwise overrules defendant's motion.**

**IT IS FURTHER ORDERED** that <u>Plaintiff's Motion For Partial Summary Judgment</u> (Doc. # 224) filed March 12, 2022 is **SUSTAINED as to defendant's RFRA defense.  The Court otherwise overrules plaintiff's motion.**

Dated this 12th day of September, 2022 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge